## UNITED STATES *v.* BALTIMORE & OHIO RAILROAD COMPANY.

### APPEAL FROM THE UNITED STATES COMMERCE COURT.

No. 385. Argued January 16, 17, 1913.—Decided December 1, 1913.

Premises occupied and used by a common carrier as a depot or freight station may become such through contract with the owners and not necessarily by lease or purchase.

The fact that the carrier leases a terminal from a shipper near that shipper's establishments does not, in the absence of any fraudulent intent, import a discrimination in favor of that shipper where the

station is actually used for the benefit alike of all shippers in that
neighborhood.

A carrier may compensate a shipper for services rendered and instru-
mentalities furnished in connection with its own shipments; and if
the amount is reasonable it is not a prohibited rebate or discrimina-
tion, even if the carrier does not allow other shippers to render and
furnish similar services and instrumentalities and compensate
them therefor.

Because a contract for terminal facilities contemplates and provides
for the publication of joint tariffs does not make the owners of the
terminal common carriers if no joint tariffs are ever filed or pub-
lished.

Where the Interstate Commerce Commission held payments for ship-
pers' services rendered and facilities furnished to be discriminatory
only in so far as similar payments for similar services are not paid to
other shippers, other questions as to the legality of such payments
which were not passed on by the Commission or the Commerce
Court are not properly before this court and will not be passed on.

*Quære,* and not now discussed or decided, whether a shipper furnishing
lighterage service within lighterage limits for a part of the rate be-
comes a common carrier and debarred from transporting his own
goods under the commodity clause of the Act to Regulate Commerce.

A shipper may be under disadvantages in regard to his shipments by
a common carrier by reason of his disadvantageous location.

200 Fed. Rep. 779, affirmed.

THE facts, which involve the legality of an order made
by the Interstate Commerce Commission regarding cer-
tain allowances made by railroad carriers to shippers and
determination of whether such allowances constituted
illegal preferences or discriminations in violation of the
Act to Regulate Commerce, are stated in the opinion.

*Mr. Solicitor General Bullitt* for the United States:

Arbuckle Brothers in operating the Jay Street Terminal
and in transporting freight by floats, etc., between Brook-
lyn and Jersey City are an integral part of the through
trunk line systems operating into and out of greater New
York, and as such are common carriers by railroad, and
are subject to the Interstate Commerce Act. *United*

*States* v. *Union Stock Yard*, 226 U. S. 286, 302, 304, 306; *United States* v. *Del. & Hud. Co.*, 213 U. S. 366.

The Hepburn Act does not authorize the railroads to make the arrangement in question with Arbuckle Bros. and to pay them for their services in transporting freight between Brooklyn and Jersey City. *Int. Comm. Comm.* v. *Diffenbaugh*, 222 U. S. 42; *Un. Pac. R. R.* v. *Updike Grain Co.*, 222 U. S. 215.

*Mr. P. J. Farrell* for the Interstate Commerce Commission:

The Commission correctly treated as one and the same concern the firm of Arbuckle Brothers and the firm styled Jay Street Terminal.

The fact that a large part of Arbuckle Brothers' sugar is sold f. o. b. Brooklyn is a matter of no importance.

The allowances are paid to Arbuckle Brothers in accordance with tariffs published and contracts entered into by the carriers. The fact that the allowances cover use of the Jay Street Terminal and all services performed there in connection with the transportation of the shipments does not change the character of the discrimination.

By confusing allowances paid to Arbuckle Brothers on their shipments of sugar with allowances paid to them on other shipments the carriers cannot make lawful a discrimination which would otherwise be unlawful.

The fact that bills of lading issued by the carriers show that their responsibility for the Federal Sugar Refining Company shipments begins at the Jersey shore is not, as between such shipments and those of Arbuckle Brothers, a matter of importance.

The right of the carriers to discriminate between Arbuckle Brothers and the Federal Sugar Refining Company does not depend upon the question of whether the latter changed its method of shipping to avoid such discrimination.

The carriers' offer to lighter the Federal Sugar Refining Company shipments from Pier 24 to the Jersey shore free of expense to that company does not change the character of the discrimination which forms the basis of the Commission's order.

The lawfulness of the discrimination does not depend upon the question of whether the allowances paid to Arbuckle Brothers are more than reasonable compensation for the services performed by them in delivering their shipments of sugar on the Jersey shore.

The court erred in stamping with the seal of good faith the contracts made with the Jay Street Terminal for the purpose of giving Arbuckle Brothers an advantage over the Federal Sugar Refining Company and denouncing as a subterfuge the change in shipping arrangements made by the latter company to remove the discrimination thus brought about.

In support of these contentions see *Gulf, Col. &c. Ry. Co.* v. *Texas,* 204 U. S. 403; *Int. Com. Com.* v. *Balt. & Ohio R. R. Co.,* 145 U. S. 263; *Un. Pac. Ry. Co.* v. *Goodridge,* 149 U. S. 680; *Cin., N. O. & Texas Pac. Ry. Co.* v. *Int. Com. Com.,* 162 U. S. 184; *Tex. Pac. Ry. Co.* v. *Int. Com. Com.,* 162 U. S. 197; *Int. Com. Com.* v. *Cin., N. O. & Tex. Pac. Ry. Co.,* 167 U. S. 479; *Wight* v. *United States,* 167 U. S. 512; *Int. Com. Com.* v. *Alabama Midland Ry. Co.,* 168 U. S. 144; *East Tenn., V. & G. Ry. Co.* v. *Int. Com. Com.,* 181 U. S. 1; *New Haven R. R. Co.* v. *Int. Com. Com.,* 200 U. S. 361; *Tex. & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Int. Com. Com.* v. *Ch. G. West. Ry. Co.,* 209 U. S. 108; *Int. Com. Com.* v. *Ill. Cent. R. R. Co.,* 215 U. S. 452; *Int. Com. Com.* v. *Del., Lack. & West. R. R. Co.,* 220 U. S. 235; *Un. Pac. R. R. Co.* v. *Updike Grain Co.,* 222 U. S. 215.

*Mr. Ernest A. Bigelow* for the Federal Sugar Refining Company:

The present arrangement between the carriers and Arbuckle and Jamison is a fraud upon the spirit and the intent and the letter of the acts to regulate commerce. The arrangement had its origin in a flagrantly unlawful preference of these great shippers and was devised to perpetuate such preference.

The form is the form of an innocent contract between a carrier and a dock and lighterage concern; the substance is that of an unlawful and unjust preference of one group of shippers as against their competitor.

Underlying the arrangement with these favored shippers is the fundamental purpose to handicap the independent company and prevent it from entering the markets on equal terms, i. e., to defeat the intention of Congress as manifested in the Act to Regulate Commerce. The lighterage limits could be expanded at will, in all directions, north, east and south, but never to Yonkers, for there was located the Federal's refinery.

The Commission's findings of fact, supported as they are by the evidence, will not be reviewed by this court, and its conclusions of law were correctly drawn.

So far as the conclusions embody findings of fact they appear not to be reviewable by the courts. A finding that there is unjust discrimination is a conclusion of fact. *Int. Com. Com.* v. *D., L. & W. R. R. Co.*, 220 U. S. 235.

The transportation referred to in § 2 of the act does not begin until the lighters are made fast to their float-bridges on the New Jersey shore, that being the point of time at which the carriers accept the goods and assume responsibility therefor. *Mo. Pac. Ry.* v. *McFadden*, 154 U. S. 155; *L. & L. Fire Ins. Co.* v. *R. W. & O. R.*, 144 N. Y. 200; *Coe* v. *Errol*, 116 U. S. 517, 528.

The single fact that Arbuckle and Jamison issue to themselves bills of lading in the name of the carriers does not suffice to overcome the legal conclusion arising from the fact that the sugar remains in their own possession and

at their own expense and risk until the lighters have made fast at the rail terminals.

On the first proposition, therefore, it is submitted the Commission has correctly disposed of the question of law, and that its finding that the arrangement between Arbuckle and Jamison and the carriers creates an unlawful discrimination, being a finding of fact which is supported by the evidence and as such not reviewable by the courts, should be accepted by this tribunal.

The Commission was right in finding that both shippers perform precisely the same service in lightering their respective shipments from points within the lighterage limits and delivering them to the appellee carriers at their rail terminals.    If, therefore, the service performed by Arbuckle and Jamison be a part of the transportation, within the scope of § 15, so also must be the service performed by the Federal Company and to pay to Arbuckle and Jamison an allowance for their services and to refuse to pay the Federal Company for its precisely similar services is to discriminate unlawfully.    *Int. Com. Com.* v. *Diffenbaugh,* 222 U. S. 42; *Union Pac. Ry.* v. *Updike Grain Co.,* 222 U. S. 215.

The Federal Company initiates the interstate transportation of its sugar, so far as these carriers are concerned, at pier 24, a point within the lighterage limits.    This is true even if Federal sugar is not discharged from the lighters at pier 24 and there is, therefore, no physical delivery. *Gulf, C. & S. F. Ry.* v. *Texas,* 204 U. S. 403.

The Federal Sugar Refining Company has no apologies to offer for adopting the expedient of rebilling at pier 24, an expedient which has received the sanction of this court in *Gulf, C. & S. F. Ry.* v. *Texas,* 204 U. S. 403.

As to the propriety of motives, a shipper is entitled to accommodate its conduct to settled principles of law, even though it be impelled thereto by an enlightened self-interest.

The so-called admission by counsel for the Federal Sugar Refining Company did not admit, at least in the sense ascribed to it by the dissenting Commissioners; and, in any event, is quite immaterial, as the Commission has power in the public interests to consider the whole subject, disembarrassed by any supposed admissions, even if contained in the statement of complaint. *C. H. & D. Ry.* v. *Int. Com. Com.*, 206 U. S. 142, 149.

*Mr. George F. Brownell*, with whom *Mr. H. A. Taylor* was on the brief, for the Railroad Companies, appellees.

*Mr. H. B. Closson* for the Brooklyn Eastern District Terminal, appellee.

*Mr. William N. Dykman* for the Jay Street Terminal and Arbuckle Brothers, appellees.

Mr. Justice Lurton delivered the opinion of the court.

This appeal involves the legality of an order made by the Interstate Commerce Commission holding that certain allowances made by the appellees to Arbuckle Brothers on sugar shipped by them over one or another of the railroad companies' lines constitute an illegal preference or discrimination in violation of the Act to Regulate Commerce. The order of the Commission required the railroad companies to cease and desist from paying such allowances, "while at the same time paying no such allowances to the Federal Sugar Refining Co.," on its sugar brought by it on lighters to the carriers at the same rail terminals. 20 I. C. C. Rep. 200. The carriers affected filed a bill in the Commerce Court alleging the invalidity and illegality of the order, and sought an injunction *pendente lite* and a permanent injunction against its enforcement. An injunction until the cause could be finally heard was granted

by the Commerce Court. This was appealed from by the United States and the injunction sustained as within the sound discretion of the court below. 225 U. S. 306. Thereupon the cause was finally heard upon motion of the appellants to dismiss the bill for want of equity, all answers and pleas theretofore filed having been withdrawn. The Commerce Court denied this motion and sustained the equity of the bill. The appellants declining to further defend, the temporary injunction was made permanent. From that decree this appeal is prosecuted.

The situation out of which the questions for decision arise, shortly stated, is this:

The railroad companies held by the Interstate Commerce Commission to have discriminated in favor of Arbuckle Brothers and against the Federal Sugar Refining Company, are interstate trunk lines whose freight rail terminals are at the New Jersey shore of the harbor of New York. Transportation of freights into and out of the City of New York is practicable only by means of car floats, barges and steam lighters, operating between the city and the New Jersey shore.

To meet this condition the appellee railroads have long held themselves out as extending transportation of freights bound east to a defined area along the river front of the city and as beginning such transportation westbound when freight is delivered at designated points within the same area. The necessary lighterage service is performed without additional cost or charge, the flat rate into or out from such points being identical with that applicable at the New Jersey rail terminals. The limits within which such lighterage service is performed as a part of the transportation assumed have long been defined and published in the several filed rate sheets of the carriers. The district embraces substantially the commercial and manufacturing river front of Greater New York, and within it the railroads hold themselves out as undertaking

to receive or deliver freight at any public dock, or at any accessible private dock where the shipper shall arrange for the use of the dock. Within this lighterage zone each of the appellees has established and long maintained public freight terminal stations, at which it will deliver east-bound freights and receive freights bound west. Some of these stations are owned or managed solely by one of the railroads and some are union stations operated for the joint use of two or all of the railroads. Some of them are operated by third persons, who manage and operate them under contracts as agents for one or more of the railroads. But whether operated under contract or directly by the company or companies using them they are represented to be public delivery and receiving stations, and are so set out in the filed tariff sheets of the companies interested.

The "allowance" to Arbuckle Brothers referred to in the order of the Commission is the consideration paid by the railroad companies to them for instrumentalities and facilities furnished and services performed in the maintenance of one of these public stations, known as the Jay Street Terminal, and for the lighterage of all freight between that station and the railroad terminals on the New Jersey shore. Arbuckle Brothers, a co-partnership, are large refiners of sugar and dealers in coffee. Much of their product of sugar finds a market in the west at points upon the lines of the railroads here involved. Their refinery is upon the water front of Brooklyn. They also own a contiguous property fronting upon East River some 1,200 feet. Upon this property they have erected a dock, piers and large warehouses for the receipt of freight intended for transportation to the railroad terminals on the New Jersey shore, or received from such terminals for consignees nearby. They also own steam lighters, car floats, barges, etc., constructed for the transfer of cars, loaded or unloaded, between this dock and the New Jersey terminals. The premises were peculiarly adapted for use

as a public union freight station, and for the purpose of extending transportation by their several lines to this portion of the commercial and manufacturing water front of Greater New York, the appellee railroad companies, in 1906, entered into separate, but identical, contracts with Arbuckle Brothers, the latter contracting under the business name and style of "The Terminal Company." The contracts are too lengthy to be set out. Their essential points may be thus summarized:

1. The Terminal Company agrees to maintain the permises in good order and condition for the receipt of freight and to provide all necessary boats, car floats, docks and piers, adequate at all times to receive, discharge, transfer and deliver freights, loaded and unloaded, adequate to accommodate the business contemplated.

2. The Terminal Company will receive at the New Jersey terminals all freights, in or out of cars, intended for delivery at the aforesaid freight station and safely convey the same to the premises and there make delivery to the consignees. It will also receive and load into cars all freights which may be delivered to it at its said premises for transportation over the lines of any of said railroad companies and carry and deliver the same to said railroad company's New Jersey rail terminals.

3. For the facilities supplied and the services performed each of the railroad companies agrees to pay on freight in and out of the station, a compensation measured by the tonnage handled for each such railroad of four and one-fifth cents per hundred pounds on freight originating at or destined to points west of what is called "trunk line territory," and on freight originating at or destined to points east thereof, three cents per hundred pounds.

Under these contracts, consignments to or by Arbuckle Brothers are handled in the same manner as the shipments of the general public, and comprise a part of the tonnage

in and out of that station by which the compensation paid to the Terminal Company is measured. This fact was the basis of the complaint made by the Federal Sugar Refining Company, whose sugar seeks the same market, and who claimed that as it lightered its sugar from its own shipping dock to the terminals at the New Jersey shore the so-called "allowance" made in respect to the sugar of Arbuckle Brothers handled under the contracts referred to above, was an unjust and an illegal discrimination unless a like allowance was made to it.

The order of the Commission does not forbid the allowance to Arbuckle Brothers as in itself illegal or unreasonable, but forbids it only as a discrimination unless a like allowance is made to the Federal Sugar Refining Company. That there is no undue discrimination against the Federal Sugar Refining Company in refusing to make a like allowance to it will appear when the conceded circumstances and conditions are considered. This latter company is a competitor of Arbuckle Brothers in the sale and shipment of sugar to the same markets. Its refinery is located at Yonkers on the Hudson River, a point some ten miles beyond the limits of the free lighterage district. It owns its docks and piers upon the river, but has never enjoyed the free lighterage privilege accorded to all shippers from docks and piers inside the free zone under the tariff sheets of the carriers. It has therefore been compelled to furnish its own means for lightering shipments from its docks to the New Jersey shore. This is an undoubted disadvantage in competing with Arbuckle Brothers, as well as with all other refiners and shippers of sugar within the lighterage district. For many years it had an arrangement with the Ben Franklin Transportation Company, an independent transportation company, by which the latter transported its sugar directly from its Yonkers dock to the railway terminals on the New Jersey shore. There it was delivered to one of the appellees and a bill of lading

signed.   The freight rates under such bills were identical with the flat rate from stations and piers within the free lighterage district.   This disadvantage arising from its location was made the subject of a prior complaint before the Commission, wherein it sought to have the free lighterage district extended so as to include its Yonkers docks, or to have an allowance made to it for the transportation of its sugar from its dock to the New Jersey terminals., Such relief would have removed the disadvantage under which it had long labored.   But this relief was denied and its petition dismissed without prejudice.   In that proceeding it was ruled by the Commission that the free lighterage arrangements theretofore made by the carriers were the only available means by which they could extend their lines to New York and were not forbidden by the Commerce Act, and that by such extension the carriers had come under no obligation to extend the district to Yonkers.   It was also ruled that the service rendered by Arbuckle Brothers in the lighterage of their own sugar from the Jay Street Terminal to the New Jersey shore was a service in aid of transportation and that for the instrumentalities and services, under the very contracts here involved, they did not receive an unreasonable consideration.   17 I. C. C. Rep. 40.

After the promulgation of that opinion the methods adopted for delivering sugar from the Yonkers dock to the New Jersey terminals were changed.   The manager of the company's city office at 138 Front Street, would notify the manager of the refinery at Yonkers every morning of the sugar necessary to fill accepted orders. This necessary sugar was then loaded at the Yonkers dock upon the lighter Ben Johnson just as before.   For this sugar the master of the lighter gave a receipt and was handed a document showing the Federal Sugar Refining Company to be the consignor and the consignee its city office, 138 Front Street.   This document also gave the

number, weight and description of the packages. The
Ben Johnson would then go down the river to pier No. 24,
within the free lighterage district, where the boat tied
up, and the city office was notified, "thereupon," say the
Commission, "the complainant issues shipping instruc-
tions to the transportation company and hands to its repre-
sentative bills of lading for execution by the carrier upon
delivery at the New Jersey shore." The lighter then pro-
ceeds to the Jersey shore where the sugar is delivered to
the carrier and the blank bills of lading are signed and
returned to the lighter's captain. For the service of the
lighter in taking the sugar to pier 24 and then across
the river to the railroad terminals, it is paid three cents
per hundred pounds. The claim upon these facts was and
is that unless an allowance is made to it identical with
that made to Arbuckle Brothers for their service in re-
spect to their own shipments of sugar, a discrimination
unlawful in character will result. And this was the con-
clusion of the Commission.

The Commerce Court was of opinion that the circum-
stances and conditions were so dissimilar as not to make
the same rule applicable and that the result reached by the
Commission was based upon manifest errors of law.

That pier 24 is within the free lighterage district and
that the defendant carriers held themselves out as ready
to take freight at any public or accessible private dock
within that zone and lighter it across the river without
any other charge than that published in their tariff sheets
applicable alike to freight delivered to them at such dock
or pier or at the New Jersey shore, is conceded. But the
carriers have not established any public station at pier 24
and the Federal Company did not notify them, nor make
any tender to them at that pier of their sugar for trans-
portation. If such sugar had been tendered to them
there and they had refused to receive it and lighter it
at their own cost across the river, a very different ques-

tion would have arisen.  That such tender was not made was obviously due to the fact that the sugar when loaded on the Ben Johnson at their Yonkers dock was destined for the railroad terminals at the New Jersey shore and thence by rail to the real consignee, the purchaser of the sugar at western points on the carriers' lines.  The sugar had been sold before it was loaded at Yonkers and the stopping at this pier and the receipt of unsigned bills of lading showing the consignees and destinations was, as the Commerce Court held, not a break in the continuity of the transportation, but a plain subterfuge to give the transaction the appearance of a shipment from pier 24. We agree with the Commerce Court and the minority of the Commission in thinking that the change in method after the failure to obtain relief in the first case did not change the substance of the transaction in point of law or fact.  The claim by the Federal Company is a claim for an allowance on account of lightering done for their own convenience, a lighterage service which under the facts of the case the carriers were under no obligation to do as a duty of transportation.  It was, therefore, a demand for a purely accessorial service, as much so as if they had claimed for carting their shipments to a depot or station.

Assuming then, that the lighterage service performed by the Federal Sugar Refining Company was a service by it for its own convenience for which the railroads were under no obligation to make compensation, we come to the question whether the facilities employed and the service performed by Arbuckle Brothers in respect to their own sugar after delivery at the Jay Street Terminal are accessorial, or services in aid of railroad transportation for which they may be paid a reasonable compensation without discriminating unduly against the Federal Sugar Refining Company.

That the plain purpose of the contracts between the

several railroad companies and the Terminal Company was to constitute the dock and warehouses of that company a public freight station is too clear for extended discussion. That the premises became such a depot through contract with the owners and not by virtue of a fee simple title or a lease is of no legal significance. *Railroad Commission of Kentucky* v. *L. & N. Railroad,* 10 I. C. C. Rep. 173, 175; *Cattle Association* v. *C., B. & Q. Railway,* 11 I. C. C. Rep. 277. Nor is there the slightest substantial evidence that in the selection of the premises of Arbuckle Brothers there was any purpose to give them as large nearby shippers any preference or to unduly discriminate against competing sugar refineries. The premises were ideally adapted to meet the necessities of the great manufacturing and commercial business interests along the river front of Brooklyn and constituted the only property reasonably obtainable by the railroads for the extension of their lines of transportation to the Brooklyn side of East River. That through instrumentalities furnished by the Terminal Company and the service by it performed transportation by the railroads begins and ends at this station, is most obvious. This continuity of transportation is not questioned by the brief for the United States in this case. Thus, after referring to the instrumentalities furnished and the services performed by the Terminal Company, it is said, "in connection with the further fact that all of the railroad companies make through rates from Brooklyn and New York to western points covering (1) the service performed by Arbuckle Bros., and (2) the transportation by rail from Jersey City westward, show such a continuity of transportation as to render argument unnecessary that the transportation from Brooklyn to western points is by one continuous transportation by railroad. The mere fact that the physical rails stop at Jersey City does not mean that the railroad transportation there ends. It continues over to

Brooklyn by means of car floats, upon which further rails are laid and on which empty and loaded freight cars stand and are transported, so that the rails upon the car floats are brought into contact with the rail ends at Jersey City and the continuation thereof at Brooklyn, and in this way the transportation by railroad is carried on without interruption from the western points directly to Brooklyn."

It is true that this clear admission by the Solicitor General is made for the purpose of establishing a contention he makes, namely, that Arbuckle Brothers under the name of the Terminal Company are in law and fact common carriers by railroad who violate the commodity clause of the Hepburn Act by transporting their own products, a view to which we later refer. The concession as to the continuity of common carrier transportation by railroad from and to this station under the published freight tariffs which include the services performed by the Terminal Company is not inconsistent with the view of the Commission, so far as transportation to and from that station is confined to the shipments made to or by one of the general public. Thus the Commission say: "So far as the general public is concerned the Arbuckle dock may doubtless be regarded as a public receiving station of the defendant." It is said further: "Arbuckle Bros., not only operate their station for the defendants as a railway facility, but they also perform the lighterage service between the dock and the regular station of the defendants on the west shore."

The order of the Commission is made to rest upon an erroneous assumption that the services performed by Arbuckle Brothers in respect of their own westbound shipments of sugar after the delivery of such sugar at this station is a shipper's service done for their convenience, with their own facilities, and, therefore, an accessorial service for which they cannot be allowed compensa-

tion unless a similar compensation is allowed to the Federal Sugar Refining Company for the lighterage of its sugar to the west shore railroad terminals.

That certain advantages enured to Arbuckle Brothers from the fact that their refinery was so near this public station that their product might be trucked or carted to the station at slight cost, is obvious. That this was a consideration which operated as an inducement to make these contracts, may be true. But this mere advantage of nearness was one which they shared in common with every other shipper who chanced to be near a shipping station. That they were large shippers was also more or less an inducement to the railroads to place their depot in a locality which would tend to secure their shipments as against rival carriers, may also be conceded. But these were business considerations which are far from showing any purpose to give them any illegal preference or to discriminate against other shippers. That the station constituted a great public utility by which the shipping public was served is too plain for argument. Although nearly one-third of all westbound shipments through that station were made by Arbuckle Brothers, the remaining two-thirds of the tonnage was furnished by the general public. Thus, the uncontradicted averment of the bill is that during the first six months of 1907 the shipments of general merchandise through that station numbered 92,622 of which more than 85,000 were by shippers other than Arbuckle Brothers, though the tonnage of the latter aggregated nearly one-third of the total. Thus it is demonstrated that while Arbuckle Brothers are by far the largest shippers, yet the advantages of the station are availed of by thousands of the general public.

Upon all of the conceded facts of the case, we must conclude that the contracts by virtue of which the premises owned by Arbuckle Brothers were converted into a public freight station under their management as agents for the

several carrier lines were contracts made in good faith and not as a cover for any fraudulent scheme to give rebates or any other illegal advantage. The case must turn here, as it did before the Commission and in the Commerce Court, upon the question whether the allowance to Arbuckle Brothers of compensation upon their own shipments was for instrumentalities and services accessorial in character. Thus the Commission say (20 I. C. C. 209):

"The complainant contends that in lightering their sugar to the Jersey shore and there delivering it to the defendants, Arbuckle Brothers perform what the complainant refers to as a purely accessorial service. We incline to think this a sound view of the matter upon the facts shown of record. Neither the actual possession of their sugar nor their relation to it is in any respect changed until it is delivered into the physical possession of the defendants at Jersey City. This fact is clearly developed upon the record. Arbuckle Brothers handle their sugar out of their own refinery to their own dock and themselves deliver it to the defendants west of the river, using in the process only property and facilities that are owned by them and employés that are paid by them. Moreover, under the terms of the contracts between them and the defendant carriers none of the duties, obligations, responsibilities, or liabilities of common carriers attaches to the defendants, with respect to the sugar of Arbuckle Brothers, until the defendants have actually received it at their regular freight stations west of the river. Yet, it is here contended that, through some sort of alchemy in their provisions, these contracts transmute Arbuckle Brothers from shippers into carriers' agents while they are in the act of delivering their own sugar to themselves at their own dock. We are not necessarily controlled, however, by the face of these documents or by the merely superficial relation that they purport to establish between these shippers and the defendant carriers, if, as seems to

be abundantly clear upon a reading of their provisions, the real and actual relation of Arbuckle Brothers to the defendants, so far as their own sugar is concerned, is that of shippers, up to the moment of time when they physically deliver their sugar to the defendants on the Jersey shore. The contracts expressly provide that until that moment the sugar is to be handled by Arbuckle Brothers at their own risk, and only from that moment does the carrier's risk begin. It is only when the defendants actually accept and physically take possession of the sugar at their receiving stations west of the river that they agree to, and do in fact, assume the liabilities of common carriers with respect to the sugar of Arbuckle Brothers."

We must now recur to the distinction drawn by the Commission between the compensation paid by the railroad companies to Arbuckle Brothers for the instrumentalities furnished and the service performed by them in respect of their own westbound shipments of sugar, and the compensation paid to them in respect to the freight handled by them through their station for the general public. The Commission find no fault with reference to the compensation paid for the latter but do find that the compensation paid for the former is an undue discrimination unless a like compensation is made to the Federal Sugar Refining Company for the lighterage of its sugar.

We have before noticed that the order of the Commission is in the alternative. The obvious inference is that the Commission found nothing unlawful *per se*, in the compensation paid to Arbuckle Brothers under the contract, although they are compensated upon a gross tonnage which includes their own sugar, for it sanctions its continuance upon condition that a like allowance shall be paid upon the sugar lightered by the Federal Sugar Refining Company. *Penn. Refining Co. v. Railroad,* 208 U. S. 208, 218.

But, as has already been shown the railroads were

under no obligation to lighter the sugar of the Federal Sugar Refining Company. Upon the other hand, if the lighterage of the Arbuckle sugar was included in the through rate from the Jay Street station, and a part of the transportation which the railroads were under obligation to perform, and that lighterage was done by Arbuckle Brothers at the instance and procurement of the carriers, they, as owners of the freight thus transported, were entitled to demand a compensation reasonably commensurate with the facilities furnished and the services performed. *Wight* v. *United States,* 167 U. S. 512; *General Electric Company* v. *New York Central Railroad,* 14 I. C. C. Rep. 237; *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42, 46. In the case last cited, it is said:

"  .  .  .  the act of Congress in terms contemplates that if the carrier receives services from an owner of property transported, or uses instrumentalities furnished by the latter, he shall pay for them. That is taken for granted in § 15; the only restriction being that he shall pay no more than is reasonable, and the only permissive element being that the Commission may determine the maximum in case there is complaint (or now, upon its own motion. Act of June 18, 1910, c. 309, § 12, 36 Stat. 539, 551). As the carrier is required to furnish this part of the transportation upon request he could not be required to do it at his own expense, and there is nothing to prevent his hiring the instrumentality instead of owning it."

This principle is not controverted, but the Commission failed to give it application, because, as shown in the excerpt from its report set out above, it construed this relation of Arbuckle Brothers, under the terms of the contract, in respect of their own shipments of sugar, "as that of shipper up to the moment of time when they physically deliver their sugar to the defendants at the Jersey shore." Again the Commission say, that, "the

contracts expressly provide that until that moment the
sugar is to be handled by Arbuckle Brothers at their
own risk and only until that moment does the carrier's
risk begin," etc.  Of course, if this was the case, their
services up to the time of delivery at the New Jersey shore,
were shipper's services, purely accessorial, and not con-
nected with or in aid of transportation by the railroad,
and, therefore, a discrimination would result unless a
like allowance was made to the Federal Sugar Refining
Company.  But this construction of the contract has no
other basis than appears in the clause defining the respon-
sibility of the Terminal Company to the contracting car-
riers while the freights remain in the Terminal Company's
physical possession.  That clause (3d) reads thus:

"The responsibility of said Terminal Company for
eastwardly bound cars and the freights therein shall be-
gin when the cars are placed upon its floats at the said float
bridges at the aforesaid station of said Railroad Company,
and shall continue as respects the cars until they have
been returned by it, loaded or empty; and as respects
the freights contained in eastwardly bound cars, its re-
sponsibility shall continue until the actual delivery thereof
to and acceptance by the consignees at Brooklyn.  As
respects the freights to be transported westbound, said
Terminal Company's responsibility shall commence at
the time the same is received from the consignor at its
aforesaid premises, and shall continue until said freights,
loaded into cars, have been brought to the float bridge
of said Railroad Company at its aforesaid freight station
and until the floats have been attached to the float bridge
and the cars are in complete readiness for removal from
the car floats by said Railroad Company."

That clause deals both with east and westbound freight
and covers both the freight and the cars of the railroad
company.  It is too plain for argument that its only pur-
pose is to fix the responsibility upon the contracting com-

pany for both the cars of the carrier and the freight of all shippers while in its physical possession. The liability imposed is between agent and principal and is substantially that imposed by general principles of law. It is plainly not intended to affect the responsibility of the carriers to all shippers after the receipt of freight for transportation, a responsibility which they hold themselves out as assuming by their published tariff sheets.

The contracts between the carriers and the Terminal Company make no distinction whatever between the duty and obligation of the latter company in respect to the shipments of Arbuckle Brothers as sugar refiners, and those made through their station by the general public. Nor was there any distinction recognized by the undisputed course of business under the contracts. When the shipments of Arbuckle Brothers were delivered at the station, carriers' bills of lading were then signed and delivered just as in the case of freight delivered by the general public. If carrier responsibility began at that station for the shipments of the public, it also began as to the freight there received from Arbuckle Brothers. The physical possession of the Arbuckle sugar, as stated by the Commission, remained with them until actually placed in the possession of the carrier on the New Jersey shore. But that is equally true as to the shipments of the general public. In both cases, however, the possession after such delivery and until delivered at the New Jersey shore was, under the contract, that of Arbuckle Brothers, under the business name of the Terminal Company, as agents of the carrier over whose lines the freight was routed and whose bill of lading had been duly issued. The Commission, while seeming to recognize this relation of agency, in effect deny it as to the freight received and receipted for at the station if it constituted a shipment by Arbuckle Brothers. But neither the words, nor the purpose of the contract, nor the actual method of conducting

the business, furnish the slightest reason for any such distinction as that drawn by the Commission. All freight, both in and out of the station, was handled in the same way.

The suggestion in the brief of the Solicitor General for the United States that "joint published tariffs are issued by the railroads and Arbuckle Bros.," has no other foundation of fact than that found in the seventh paragraph of the contract between the Erie Railroad and the Terminal Company, where it is said, that the Terminal Company, "shall not be required to receive or carry any freight which may from time to time be classed as prohibited freights in the joint published tariffs of itself and the railroad company." But there is not a scintilla of evidence that any such joint published tariffs have ever been filed or published, nor that the Terminal Company has ever published or been required to file any tariff sheets whatever. The filed tariff sheets showing the services performed by Arbuckle Brothers, and the facilities provided for extending transportation between the New Jersey terminals and this station, are those published and filed by the railroad companies, who thereby hold themselves out as common carriers to and from this station. That it might originally have been expected that the Terminal Company might join in such published tariffs is possible. That it never did, is plain.

To say that the "allowance" made to Arbuckle Brothers is an allowance for lightering their own sugar across the river is to only half state the case. This so-called allowance is not only for such lighterage service, but is also compensation for the use of all of the terminal properties, docks, warehouses, tracks, steam lighters, car floats and every instrumentality used under the contract. It includes the services and responsibility of Arbuckle Brothers, as agents for the several lessees using the station, and their staff of employés engaged in receiving, delivering,

loading and unloading freights thus received, both incoming and outgoing. As the measure of compensation is the tonnage in and out of the station and as this compensation is paid by the several railroads maintaining the station in proportion to the tonnage which they severally handle, there is a sense in which it is in part an allowance to Arbuckle Brothers upon their own shipments. But they receive the same compensation upon the tonnage of every other shipper through that station, and it is the aggregate of the compensation which must determine the reasonableness of the allowance when we come to deal with it as an allowance to them for services or instrumentalities furnished, under § 15 of the Act to Regulate Commerce.

That the compensation of three and four and one-fifth cents per hundred pounds upon the total tonnage in and out of this station is not unreasonable was and is not challenged, and therefore we pass that subject by.

The contention to which we have hitherto referred that the arrangement made by the Terminal Company violates the commodity clause of the Act to Regulate Commerce is not necessary to be considered. There is nothing in the record showing that such a contention was pressed upon the Commission, considered by that body, or that the order rendered was in any respect based upon the commodity clause. Indeed, the order permitted the continuance of the Jay Street Terminal and the business there conducted, providing only that like rights and allowances were made to the Federal Sugar Refining Company. The order, therefore, cannot be assumed to have contemplated that the Jay Street Terminal business was a violation of the commodity clause, since under that hypothesis the conclusion would be inevitable that the Commission by its order gave sanction to and permitted the continuance of the wrong which its powers were exerted to suppress. As we do not consider the conten-

tions concerning the commodity clause as properly arising for decision and hence do not pass on them, they are not foreclosed, and hence our action in this case will be without prejudice to the right to assert them in the future if those having the right to do so are so advised.

Viewing the whole case in a broad light, it is apparent that the disadvantage under which the Federal Sugar Refining Company labors is one which arises out of its disadvantageous location. That disadvantage would still remain if the title to the Jay Street station was in the railroad companies, and its business in charge of a third person.

*We fail to find any error in the decree of the Commerce Court holding the order of the Commission void, and its decree is accordingly approved.*