**LONG ISLAND RAIL ROAD COMPANY, Plaintiff,**

v.

**DELAWARE, LACKAWANNA & WESTERN RAILROAD COMPANY, Lehigh Valley Railroad Company, Erie Railroad Company and New York, Chicago & St. Louis Railroad Company, Defendants.**

Civ. A. No. 16628.

United States District Court
E. D. New York.
May 13, 1960.

320

Otto M. Buerger, Jamaica, N. Y., for plaintiff, by Richard H. Stokes, New York City, of counsel.

Richard E. Costello, New York City, for defendants, Delaware, Lackawanna & Western R. Co., and New York, Chicago & St. Louis R. Co.

Frederick G. Hoffmann, New York City, for defendant, Erie R. Co.

John F. Finerty, New York City, for intervenor, Brooklyn Eastern Dist. Terminal.

BYERS, District Judge.

This cause has been pending since June 15, 1956 when the complaint was filed; it has been explained in the opinion reported in 143 F.Supp. 363 in connection with a plaintiff's motion for a temporary injunction, and defendants' cross-motion to dismiss, both of which were denied.

Since the date of that decision (July 2, 1956), the I.C.C. has passed upon the matters presented in the plaintiff's asserted "Second Cause of Action" namely, that "the afore-described piggyback service will be transportation by motor vehicle without a certificate of public convenience and necessity as required by the Interstate Commerce Act Sec. 206(1) [49 U.S.C.A. § 306(1)]."

The Commission action is reported in Long Island Rail Road Company v. D. L. & W., et al., No. 31,979 (302 I.C.C. 577) as announced in a decision dated January 22, 1958. That is the so-called Section 13 proceeding referred to in the case of Long Island Rail Road Company v. United States, D.C., 140 F.Supp. 823, at page 830.

That I.C.C. complaint attacked the schedules filed by the defendant railroads as unlawful upon the same grounds as are alleged in the complaint in this cause. The decision thus states those allegations:

"* * * that the service proposed is not transportation by motor vehicle incident to rail transportation in the performance within terminal areas of transfer, collection, or delivery service within the meaning of section 202(c) of the Interstate Commerce Act, but constitutes an extension of the defendants' lines of railroad without the certificates of convenience and necessity required by section 1(18) of the act; or that the operation being line-haul in nature, it is unlawful without the certificates of convenience and necessity for motor service required by section 206(a)."

As to the substance of the plaintiff's first cause as here pleaded, the decision says:

"In Texas & P. Ry. Co. v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 273 [46 S.Ct. 263, 70 L.Ed. 578], and Powell v. United States, 300 U.S. 276, 287 [57 S.Ct. 470, 81 L.Ed. 643], both cited by the district court, the Supreme Court held that the ultimate determination of whether certain facilities constitute an exten-

sion of a line of railroad subject to section 1(18) is within the exclusive jurisdiction of the courts, either in a suit to set aside an order granting a certificate or in a suit under section 1(20) to enjoin a violation of section 1(18)."

In conformity thereto, the further discussion in the said decision was confined to the terminal area dispute (namely, the bearing of the exemption of section 202(c) (1) as to the piggy-back service of the defendants).

The decision proceeds to analyze the service as rendered by all railroads involved, and by the intervenor, and also the financial results during the years 1954 and 1955, and for the first five months of 1956; also the effects upon traffic and the evident diversion of a portion of it from motor carriers to railroads as the result of the institution of the rail-trailer service.

Reference is made to prior proceedings before the Commission in the matters of Trailers on Flatcars, Eastern Territory, 296 I.C.C. 219 and Pickup and Delivery Limits at Los Angeles, Calif., 299 I.C.C. 347, and the similarity therein to the instant issues.

The decision concludes with this language:

"We find that the motor transportation of freight in truck trailers by the defendant railroads over the public highways between their respective rail terminals in New Jersey and the premises of consignors and consignees in the Borough of Queens, New York City, incident to the line-haul movement of such freight in trailer-on-flatcar service, is bona fide terminal-area collection-and-delivery service incidental to transportation by railroad within the meaning of section 202(c) of the act, and lawfully may be performed without certificates issued under part II of the act; and that the tariffs of the defendants providing for such services are not shown to

be unlawful. The complaint will be dismissed."

Part II of the Act has to do with the regulation of motor carriers as such, and not with railroads.

It is requisite to an understanding of the legal arguments now addressed to this court, to be clear as to the precise decision of the I.C.C. which was denied reconsideration on August 5, 1958.

No appeal was taken therefrom; therefore it is to be deemed final for present purposes.

It should be interpolated that Lehigh Valley Railroad Company named as a defendant has taken a neutral position. As to the "Nickel Plate," (N. Y. C. & St. L. R. Co.) the Erie and D. L. & W. main brief states:

"The New York, Chicago & St. Louis Railroad Company is a defendant herein whose right to maintain joint rates to points in Queens will depend solely on the disposition of the causes of action stated in the complaint herein against defendant Lackawanna."

This explains why no brief is filed separately by that railroad. References hereinafter to the defendants will designate the Erie and the D. L. & W.

The Eastern District Terminal has been permitted to intervene as a party to the cause. This was consonant with the procedure in the case of Long Island Rail Road Co. v. United States, 140 F. Supp. 823 (supra), the original proceeding before the I.C.C. The intervenor has briefed its present contentions in great detail, in part to meet the contention of the defendants that it is not a party in interest "and is not entitled to the relief sought * * * in the absence of evidence that defendants' piggy-back operations serve points in the Borough of Queens, New York City, which are reached by intervenor's rails or facilities or which defendants had not heretofore served in their water-borne service."

The parties have in effect stipulated the facts to avoid the taking of testi-

mony; see Pre-trial Order of January 29, 1960 and Appendix A and B thereto. The latter was supplemented on March 7, 1960 as to matters involved affecting the intervenor.

Appendix C states:

"Statement of Contested Issues of Fact

"1. If material as a matter of law, whether or not the Borough of Queens, New York City, is located within the defendants' terminal area.

"2. Whether or not there is any difference between the pick-up and delivery of trailers in piggy-back service and pick-up and delivery service as defined in New York Dock Railway v. Penn. R. Co. [D.C.], 1 F.Supp. 20, aff'd [3 Cir.] 62 F.2d 1010, pages 1013–14, cert. denied 289 U.S. 750 [53 S.Ct. 694, 77 L.Ed. 1495]."

It will be seen that the latter deals with the first cause stated in the present complaint, and the former, with the second.

The contentions advanced by the intervenor are not in all respects the same as those of the plaintiff.

The several matters which are discussed in the eleven briefs that have been filed, will be considered in order:

## Jurisdiction

1. As to the first cause, the applicable provision of the Interstate Commerce Act is found in Title 49 U.S.C.A. § 1(18):

"§ 1, par. (18). *Extension or abandonment of lines; certificate required;* * * *

No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate * * *."

The plaintiff and the intervenor seek an injunction against the defendants' operation of a piggy-back service as heretofore explained, because no such certificate has been obtained. It has been stated that the decision of this issue is deemed to be within the exclusive jurisdiction of this court.

There is an oblique argument that as defendants view the controversy, the plaintiff and the intervenor are opposed to the ruling of the Commission concerning the terminal area subject (the second cause), and that such position is in legal effect the assertion that corrective judicial action as to that is called for; thus the court is required to abandon its announced purpose, because the subject-matter would pertain only to a three judge court (Title 28 U.S.C. §§ 2321 and 2325).

It is unnecessary to discuss this contention in detail, for the reason that the plaintiff and the intervenor in their final arguments, took the position that they now agree that the said decision is accepted by them as dispositive of the second cause pleaded in the complaint. This seems to mean that they now concede that the piggy-back service as operated by the defendants in the Borough of Queens falls within the exemption of § 202(c) of the Act (Title 49 U.S.C.A. § 302(c) (1). So much is clear at least as to the present position of the intervenor.

As to the plaintiff, it appears also that the I.C.C. decision is not deemed directly brought into question. Thus at the argument of March 7, 1960, the record shows:

"The Court: (To plaintiff's counsel) * * * Aren't you seeking to set aside an order of the Interstate Commerce Commission which holds that this service is rendered within the terminal area?

"Mr. Stokes: No, your Honor, we are not.

"What we are asking the Court at this time to do is to find that on the basis of the Interstate Commerce Commission's decision, their own language, that this constitutes an expansion or an extension of their terminal—of the limits of their terminal area—and that such expansion or extension must also have a Section 1(18) certificate."

The court understands that the decision of the I.C.C. concerning the terminal area aspect of the case is not being questioned as such, but the plaintiff does argue that it must be interpreted as though that decision physically enlarged or extended the terminal area of the defendants, thereby in effect permitting them to extend their respective railroads without the said certificate.

The defendants' argument touching jurisdiction is thus disposed of by the present position of the plaintiff and the intervenor. This of necessity also takes care of the defendants' assertion that the United States is a necessary party, since no review of the I.C.C. decision is now being sought.

This decision, therefore, will proceed on the theory that the court has jurisdiction of the causes in their entirety.

2. As to the scope and effect of the decision of the I.C.C. concerning the terminal area aspect of the controversy, namely that no certificate of necessity was required because of the exemptions stated in § 202(c) of the Act (Title 49 U.S.C.A. § 302(c) (1), there is this to be said:

The section has to do with the transportation of passengers or property by interstate motor carriers and the regulation thereof; (c) provides exemptions from certain stated requirements. Thus,

"(1) to transportation by motor vehicle by a carrier by railroad subject to chapter 1 of this title, * * * in the performance within terminal areas of transfer, collection, or delivery services; but such transportation shall be considered to be and shall be regulated as transporta-

tion subject to chapter 1 of this title when performed by such carrier by railroad * * *."

The argument for the plaintiff and the intervenor is that even though the piggy-back service is performed within the terminal area as ascertained by the Commission, it none the less constitutes an extension of their railroads therein, whereby a certificate of necessity becomes requisite.

This contention is addressed to the true nature of the operation involved in the delivery from the terminals in Jersey City to the points of destination in the Borough of Queens of the vans or trucks which have been carried on flat cars to those terminals.

It is necessary to consult the Act for definitions; manifestly, the statutory definition of a railroad will determine what is necessarily an extension thereof.

Section 1, paragraph 3, contains the following:

" * * * The term 'railroad' as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, * * * and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term 'transportation' as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, * * * and all services in connection with the receipt, delivery, elevation, and transfer in transit, * * * and handling of property transported. * * *."

Clearly the vans or trucks which are carried on flat cars do not fall within the statutory definition of the word "rail-

road" in which it seems that all physical components thereof are carefully specified as the things employed in the transportation of property. So much tells us what Congress conceived a railroad *to be.*

What a railroad *does* is to carry or transport; the definition of transportation describes the instrumentalities so employed; thus it seems clear that these vans or trucks are "other vehicles * * * instrumentalities * * * of shipment or carriage * * *."

The *interdiction* of § 1(18) is directed to the expansion of a railroad, not to developments concerning the methods whereby the transportation function is performed arising from competition in that field.

The foregoing states this court's understanding of the meaning of the statutes that govern this controversy, and since it is contrary to the arguments presented by the plaintiff and the intervenor, it must be tested in the light of the contentions that they bring to bear.

### Plaintiff's arguments

1. The Commission's delineation of the Borough of Queens as being within the defendants' terminal area actually brings about an enlargement thereof and thus, as a necessary consequence, the extension of the defendants' railroads.

To dispose of this contention requires that the court shall either express its disagreement with or its concurrence in the *decision* of the I.C.C. in No. 31,979, 302 I.C.C. 577. The latter choice is the outcome of a careful reading of that decision.

The factual analysis therein contained reveals familiarity with matters not sought here to be made the subject of proof; also an understanding of the attendant circumstances, in a field of special insight which this court of course does not possess. The decision is not here challenged as to the evidence upon which the Commission acted; nor is

there an assertion that there was anything arbitrary or capricious in the consideration or disposition of the entire subject matter.

This court accepts the decision, as it would the findings of a special master if one had been appointed in this case, for lack of reason pointing to a contrary result. As has been stated, it is the impact of that decision upon the first cause of action, rather than the decision itself, upon which the plaintiff relies. To that contention, the court now turns.

Having in mind that the subject passed upon by the Commission was the nature of the *activity complained of*, rather than the instrumentality of performance, the language used which has been quoted, may be repeated in part:

"We find that the motor transportation * * * incident to the line-haul movement of such freight * * * is bona fide terminal-area collection-and-delivery service incidental to transportation by railroad within the meaning of section 202 (c) of the act, and lawfully may be performed without certificates issued under part II of the act; * * *."

The foregoing follows a reference to another case in which it was said,

" * * * In that proceeding, numerous separate communities and muncipalities were found to be so related to the base municipality as to constitute integral parts of an industrial and business metropolis and to justify their inclusion in the terminal area of a railroad serving the base community. A similar conclusion is warranted here."

It is true that there is no indication of the date to be ascribed to a similar development as to the Borough of Queens in the City of New York; nor does the necessity for such a detail seem to be apparent.

The Commission dealt with facts as it found them to exist as of the date when the complaint before it was filed.

A contrary view would at most call for a historical recital of the various steps that resulted in the creation of the practical condition that confronted the Commission when it was asked by the plaintiff to take action favorable to it. The ultimate fact, rather than a tedious recital of events leading up to it, was the important consideration.

Of course the industrial changes that have attended the growth and present physical constituency of the Borough of Queens, have taken place since the City of New York attained its present municipal status in 1898. So much is the subject of common knowledge.

It was the function of the Commission to decide whether the then current activities (1956) of the defendants fell within the statutory exception heretofore alluded to. That was to be determined primarily from the standpoint of railroad operation, with all geographical incidents to be assumed. This is another way of stating that in the opinion of this court the Commission was not concerned, in connection with the second cause, with possible contentions concerning the expansion of railroads to enable them to function within a given terminal area; it follows that the latter question is a thing apart from the nature of the transportation aspect of the quoted definition from the Act. So much of the plaintiff's argument is deemed to be unconvincing.

2. That since the statutory definition of a railroad includes "terminal facilities," a terminal area is necessarily included or implied, whereby an extension of railroad therein requires the issuance of a certificate.

Thus, to quote from plaintiff's brief:

"If 'terminal facilities' include 'freight depots, yards and grounds' then the 'terminal' must be the area within which these facilities are contained or in other words the terminal area of the rail carriers. Thus if terminal area is included within the definition of 'railroad' as defined in § 1(3), it means that any extension or expansion of a terminal area is an extension or expansion of a 'line of railroad' within the meaning of § 1(18) of the Act.

"In respect of the foregoing argument, plaintiff would like to advise the court that this particular question seems to be one of first impression. Extensive research has not revealed any decision of the courts interpreting these particular words of the Act."

If understood, this means that the piggy-back vans and trucks are to be included in the term "railroad" in the statutory definition, because they are to be classed as falling within "terminal facilities of every kind."

However, the sentence containing the quoted words begins "and also all switches, spurs, tracks, terminals, and terminal facilities" etc. It is thus apparent that the term "terminal facilities" means facilities of the terminal buildings, such as ramps, platforms, piers, steps, etc., but not separate mobile units such as vans and trucks that are carried on flat cars for possible handling *at* terminals. The difference which this court perceives between the terminals which are part of the railroad transportation equipment, and the terminal areas, namely the geographical dimensions of the territory in which the carriers perform or function, cannot be ignored in the process of seeking to ascertain the intent of Congress.

The effort has been made to expose that difference with the result that so much of plaintiff's argument must be rejected. This conclusion is thought to be consonant with the views of the Commission in Pick-Up etc., 238 I.C.C. 671, and N. Y. S. & W. R. R. etc., 34 M.C.C. 581, quoted in plaintiff's brief.

3. That the piggy-back service is not bona fide pick-up and delivery service.

This point will be considered in connection with the arguments made by the intervenor, now to be considered.

### Intervenor's contentions

Before discussing these points, it should be said that the status of in-

tervenor in this case is deemed to be clearly established. See Appendix B, page 7, Pre-trial Order paragraphs 19 and 20 as supplemented by Stipulation filed March 7, 1960, whereby Rule 24(a)(2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. is brought into operation.

1. This court should not follow the decision of New York Dock Railway, et al., v. Pennsylvania R. Co., 3 Cir., 62 F. 2d 1010.

The arguments in support of this assertion are (a) that it contains an erroneous recital of the facts, and (b) that anyhow it was incorrectly decided.

The intervenor was an unsuccessful party to that cause, represented therein by its present counsel.

That case for present purposes, decides that pick-up and delivery service within the terminal area of that defendant railroad, was a facility of transportation, not an extension of a railroad line.

The intervenor's argument by necessary implication concedes that a pick-up and delivery service is not different, in principle, from piggy-back service.

If a finding to that effect is appropriate, and perhaps it is, this court so finds. There is no argument to the contrary, nor has contradictory testimony been offered.

The principal criticism directed to the opinion is to the following excerpt (at page 1011):

"The Pennsylvania Railroad Company, appellee, is a common carrier operating a line of railroad whose eastern terminus physically is at the New Jersey waterfront opposite the city of New York but actually—by use of car floats and force of statute—at stations across the river on the waterfront of Manhattan, Brooklyn, the Bronx, and other boroughs within the commercial area known as the port of New York. Of the complainants-appellants, some are common carriers and others are not; but all are engaged in one way or another—principally by trucks— in exchanging freight or receiving and delivering freight (under contracts with consignees and consignors) at the New York terminals of the Pennsylvania Railroad Company where, at present, transportation over that system begins or ends according to the direction of the traffic.

"The railroad company proposes, without leave of the Interstate Commerce Commission, to deliver freight by motor trucks from its terminals directly to consignees and receive freight from consignors for delivery by trucks to its terminals and thus establish what it calls an 'accessorial terminal service,' popularly described as 'store door delivery and receipt of freight,' charging therefor tariffs to be filed with and approved by the Interstate Commerce Commission. The complainants, being vitally interested in the threatened invasion of their business of trucking and moving freight to and from the railroad company's terminals, filed a bill in the District Court of the United States for the Eastern District of Pennsylvania to stop it. The theory of the bill is that the proposed practice will not be a 'terminal service' at all but will be an 'extension' of the company's 'line of railroad,' involving abandonment of its lines of car floats and lighters, which the railroad company may not do lawfully without first obtaining a certificate of public convenience and necessity from the Interstate Commerce Commission as provided by section 1, paragraph 18 of the Interstate Commerce Act, amended by the Transportation Act of 1920, § 402, U.S.Code, title 49, chapter 1, § 1, 49 U.S.C.A. § 1(18)."

The intervenor's brief contains comments on the foregoing to the effect that none of the appellants was engaged in transporting freight principally by trucks since they employed only car floats for that purpose; nor were they ex-

changing or delivering freight at the New York terminals of the Pennsylvania; also that the complained of pick-up and delivery transportation by the Pennsylvania was under tariffs which did not apply to the latter's North Fourth Street station or any other, but solely "to and from Pennsylvania's New Jersey railhead stations."

The dispositive portions of the criticized opinion follow:

"If, by paragraph 18 of section 1 of the act, the Congress had declared against an extension of 'transportation,' it would likely apply to the defendant's proposed service. If it had declared against an extension of a 'railroad,' its meaning might be open to debate. But when it declared against an extension (without a certificate) of a 'line' of railroad, words, we must assume, it expressly selected, and often repeated in other sections of the act directed to the same subject, it would seem that the Congress, making distinctions or intent upon making its purpose certain, meant precisely what it said, namely, 'an extension of its line,' that is, an extension of the railroad company's road, yards, tracks, with their terminals and terminal facilities, and barges, car floats, lighters and ferries, or so many of these instrumentalities as would, in a given instance, constitute a 'line.' United States v. B. & O. R. R. Co., 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218.

\* \* \* \* \* \*

"Except that it is contested, it would seem that the words in question plainly mean not an extension of a transportation service in connection with an established railroad but an extension of a railroad line, the thing itself.

"Looking at the service termed 'accessorial terminal service' which the defendant railroad company here proposes to put into effect and searching for its true character and exact place in a system of rail trans-

portation, it clearly is not a 'railroad.' It is a 'service'; one 'connected with the receipt and delivery \* \* \* of property transported' within the definition of 'transportation.' The creation and extension of such a service is not in any sense a 'construction' or an 'extension of (a) line of railroad' for which a certificate is required. It may be, and doubtless is, an improvement and extension of transportation service for which no certificate is required yet for which tariffs must be filed. Moreover, the spirit and purpose of the act, so far interpreted, indicate it to be a service for terminal receipt and delivery of freight by motor truck, a facility of transportation, not an extension of a railroad line." At pages 1013–1014.

It must be owned that the factual recital as to the complainants activities differs from that shown in the decision below reported in 1 F.Supp. 20. Thus,

" '(b) As to shippers and receivers of freight in the Borough of Brooklyn and Queens, the Pennsylvania Railroad Company will transport, receive and deliver the freight to and from the places of business of such shippers and consignees located throughout Brooklyn, Manhattan and Queens, instead of as at present and as for many years, at the freight stations of the Pennsylvania Railroad Company on the waterfronts of Brooklyn and Queens as hereinabove described.

" '(c) Rendition of such new railroad transportation service by the Pennsylvania Railroad Company to and from the places of business of shippers and consignees in the Boroughs of Manhattan, Brooklyn and Queens, instead of to and from the waterfront stations as now and as for a long time heretofore provided, is intended of accomplishment by means of motor truck conveyance between the waterfront yards of the Pennsylvania Railroad Company on the New Jersey side of the harbor

and the places of business of shippers and consignees in the Boroughs of Manhattan, Brooklyn and Queens, which such motor trucks will among the other methods move across the harbor under their own power through tunnels and over bridges, using for that purpose the many miles of streets of the Cities of New Jersey and New York.'

\*    \*    \*    \*    \*    \*

"The contention that the proposed change constitutes an extension and abandonment of line was most ably and forcibly argued by counsel for complainants. Their allegations of fact in connection with the proposed new service were not disputed. Their conclusions and inferences to be drawn from those facts were disputed. After giving due weight and most careful consideration to the arguments advanced by complainants and the defendant, the court is of the opinion that the proposed new service does not constitute an extension or abandonment of line within the meaning of the acts of Congress relating to the Interstate Commerce Commission as interpreted by the decisions cited. This is the opinion of the court based on the pleadings and the arguments furnished. What the Interstate Commerce Commission might conclude based upon a more extensive argument and a complete investigation properly conducted is not for this court to say. The Interstate Commerce Commission will have an opportunity to pass upon the question if it so desires when the proposed tariff schedules are posted or filed with the Commission. They will have direct notice of the proposed changes, and, if they are of the opinion that the new service constitutes an extension and abandonment of line in fact, the Commission will no doubt make its own inquiry and its own ruling. This court cannot assume that the Commission will fail in its duty to the law or to the public." At pages 20–21.

Thus the precise factual situation of the complainants was embodied in the record before the reviewing court, and its recital in the opinion which intervenor criticizes, cannot change the record as it was made. It is to be assumed that the discrepancy was called to the attention of the Supreme Court where certiorari was denied (289 U.S. 750, 53 S.Ct. 694, 77 L.Ed. 1495).

Even if there was an appellate misapprehension of the activities of the complainants in that case, there was no misunderstanding of the nature and character of the service being performed by the railroad. That was the question decided, and the basic reasoning is convincing to this court.

The attempt has been made to analyze the present case as though the subject were new, in the effort to reach an independent conclusion; the result is, to come to the same decision as in New York Dock. This means that that decision will be followed.

The Commission seems to have approved the latter case in Absorption of Drayage, etc., 197 I.C.C. 675.

As has been stated, the Commission did not decide in this case the plaintiff's and intervenor's first cause of action touching the alleged extension of the defendants' railroads. For reasons heretofore stated, this court hereby decides that cause in favor of the defendants on the merits.

It is probably unnecessary to discuss the defendants' argument that in no case can an injunction be issued against them in the absence of a showing of irreparable damage on the part of the plaintiff. That is at least a questionable proposition, in view of the language of the Supreme Court in Texas & Pacific Ry. Co. v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 264, 70 L.Ed. 578, in which it is stated that

"\* \* \* The prohibition of paragraph 18 (i. e., § 1(18) supra) is absolute. If the proposed track is an extension and no certificate has been

obtained the party in interest opposing construction is entitled as of right to an injunction."

Since the injunction here sought is denied on the merits, the point can be reserved for adjudication in an action in which the issue is necessarily presented.

2. That the piggy-back service in dispute is a terminal facility and hence part of the defendants' railroads, for the special reason that when § 203(b) (8) is construed in connection with § 202(c) (2) and § 206(a) (1), that result necessarily ensues.

This argument has been carefully examined in view of the extended treatment accorded to it in the intervenor's fourth brief, filed April 20, 1960, from which the following is quoted:

> "Therefore, unless this Court is willing to hold, *as a matter of law,* that motor vehicle transportation by or for rail carriers *within* their terminal areas does not come within the definition of the term 'railroad' in § 1(a) (3) [(3) (a)] of the Act, as including '*terminal facilities of every kind,* etc.' and, therefore, does not constitute an extension of such carrier's 'line of railroad', within the meaning of § 1(18), the provisions of § 202(c) (2) do not exempt rail carriers from the requirements of certificates under § 1(18). At most, those provisions exempt only '*local*' *motor carriers*, performing motor vehicle transportation *within* the *terminal* areas of such rail carriers from the requirements of certificates under § 206(a) (1)."

Pages 7 to 12 are devoted to an exposition of the reasoning upon which the foregoing is based. The decisions of the Commission are discussed with the comment that each such decision overstated the effect to be given § 202(c) (2) as repealing by necessary implication the prior exception contained in § 203(b) (8) of the Motor Carrier Act of 1935 (Part II of the present statute).

Pages 8 and 12 of the same brief contain the following:

> "It is true that, as stated p. 21 of defendants' brief, that the repeal by § 202(c) (2) of the previous *exception* in § 203(b) (8), makes untenable the point raised at pp. 20–22 of intervenor's original brief and at pp. 10–12 of intervenor's supplemental brief, that the persistent refusal of the Commission to recognize that motor vehicle transportation by or for rail carriers *within* their terminal areas results in discrimination against over-the-road motor carriers, since that point was based on the assumption that such *exception* in § 203(b) (8) was still effective.

> \*     \*     \*     \*     \*     \*

> "In conclusion, therefore, on this point, intervenor respectfully submits that there is nothing in § 202 (c) (2) which would, in itself or by necessary implication, warrant this court in holding that rail carriers, performing motor vehicle transportation *within* their terminal areas under § 202(c) (1), or having such transportation performed *for them* by 'local' motor carriers under § 202 (c) (2), do not require certificates under § 1(18)."

The special emphasis which the intervenor places on this aspect of its argument has been carefully weighed, and found wanting. To state the matter simply, the regulation of motor haulage transportation is within the obvious purpose of Part II of the Act. Reference therein to that subject matter applies primarily to motor haulage, not to railroad operation. Where such haulage is auxiliary to railroad operation, the exception to the requirement of a certificate of public convenience and necessity is stated, with respect to motor haulage as such, and not so as to introduce a concept which is appropriate to the subject of railroads as such—the subject matter of Part I—and to the functions which they perform.

To confuse these two basic aspects of the congressional process is to contribute clarity of understanding to neither.

The restatement of the intervenor's argument under Point II (fourth brief) of reasons why the piggy-back service should be classified within "terminal facilities of every kind" calls for no discussion in this opinion which has not been heretofore set forth.

It results that judgment should be awarded to the defendants on the merits, with costs, which is to be settled on notice. The judgment should recite that the stipulation of uncontested facts (Appendix B) attached to the Pre-trial Order of January 29, 1960, as supplemented under date of March 7, 1960, is deemed to be incorporated as the findings upon which this decision is based.