## NEW YORK DOCK RY. et al. v. PENNSYLVANIA R. CO.

No. 4989.

Circuit Court of Appeals, Third Circuit.
Jan. 10, 1933.

Charles E. Cotterill, of New York City, and John F. Finerty, of Washington, D. C. (Henry B. Closson, Abner J. Grossman, and Davies, Auerbach & Cornell, all of New York City, Cotterill, Hopkins & Ward, of Atlanta, Ga., and Edwin A. Lucas and Drinker, Biddle & Reath, all of Philadelphia, Pa., of counsel), for appellants.

Henry Wolf Bikle and Barnes, Biddle & Myers, all of Philadelphia, Pa., for appellee.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

The Pennsylvania Railroad Company, appellee, is a common carrier operating a line of railroad whose eastern terminus physically is at the New Jersey waterfront opposite the city of New York but actually—by use of car floats and force of statute—at stations across the river on the waterfront of Manhattan, Brooklyn, the Bronx, and other boroughs within the commercial area known as the port of New York. Of the complainants-appellants, some are common carriers and others are not; but all are engaged in one way or another—principally by trucks—in exchanging freight or receiving and delivering freight (under contracts with consignees and consignors) at the New York terminals of the Pennsylvania Railroad Company where, at present, transportation over that system begins or ends according to the direction of the traffic.

The railroad company proposes, without leave of the Interstate Commerce Commission, to deliver freight by motor trucks from its terminals directly to consignees and receive freight from consignors for delivery by trucks to its terminals and thus establish what it calls an "accessorial terminal service," popularly described as "store door delivery and receipt of freight," charging therefor tariffs to be filed with and approved by the Interstate Commerce Commission. The complainants, being vitally interested in the threatened invasion of their business of trucking and moving freight to and from the railroad company's terminals, filed a bill in the District Court of the United States for the Eastern District of Pennsylvania to stop it. The theory of the bill is that the proposed practice will not be a "terminal service" at all but will be an "extension" of the company's "line of railroad," involving abandon-

ment of its lines of car floats and lighters, which the railroad company may not do lawfully without first obtaining a certificate of public convenience and necessity from the Interstate Commerce Commission as provided by section 1, paragraph 18 of the Interstate Commerce Act, amended by the Transportation Act of 1920, § 402, U. S. Code, title 49, chapter 1, § 1, 49 USCA § 1 (18).

The case came before the District Court on a motion by the complainants for a preliminary injunction and a motion by the railroad company to dismiss the bill. The court denied the application for injunction and dismissed the bill. The complainants appealed, bringing the case here on many assignments of error which, when compressed, raise one question—with two sides—what, in legal effect, is the railroad company's proposed practice, a "terminal service" or facility incident to transportation of freight subject only to approval by the Interstate Commerce Commission of tariffs to be charged for the same, or an "extension of its line of railroad," for which, to be legal, the railroad company must first obtain a certificate of public convenience and necessity from the Interstate Commerce Commission?

On the threshold of the argument in this court the railroad company moved to dismiss the appeal on the contention that the situation as it stood before the District Court is now in point of fact non-existent, and that in consequence the issues in the case have become moot, predicating both contentions on the single fact that in the meantime the railroad company had filed tariffs (certain of the complainants participating) for the proposed trucking service with the Interstate Commerce Commission, which body, in passing upon the tariffs (it says) may consider whether the proposed service constitutes an "extension of its line of railroad."

We are not impressed by the motion to dismiss the appeal for several reasons. The first that leaps to the eye is that, though tariffs have been filed, the Interstate Commerce Commission has not approved them and that, until approved, they are not effective. It is possible the Interstate Commerce Commission may do something which may alter or nullify the factual effect of filing tariffs and leave the case where it stands on the record. Then again, even if the Commission should approve the tariffs, and even hold sometime in the future that the proposed service is not "an extension of its line of railroad," the railroad company has not convinced us that such action would annul the

complainants' right, on a proper showing, to resort to the remedy by injunction afforded by section 1 (20) of the Interstate Commerce Act, as added by Transportation Act, § 402, 49 USCA § 1 (20), or that when, as here, such remedy has been invoked, the courts must wait for the question to be presented to and decided by the Commission. Texas & Pacific Ry. Co. v. Gulf, etc., Ry. Co., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578. Therefore, without deciding any procedural matter that is past or is yet to come, we deny the motion to dismiss on our preference to meet the question raised on this appeal frontally and dispose of it on the record as it stands.

Further clearing the way to discussion of the main issue, we shall lay aside as an issue not here involved the complainants' contention that by the described service the railroad company proposes to abandon the lighterage parts of its line and return to its rail heads in Jersey City without obtaining a certificate of public convenience and necessity from the Interstate Commerce Commission. We do this for the reason the contention is based not on an out and out averment of fact in that regard (admitted by the motion to dismiss) but on an alleged mental attitude of the railroad company and on an inference, purely argumentative, that abandonment of the lighterage lines between New York City and Jersey City is an "eventual" consequence of the alleged "extension" of the railroad company's main line by trucks. Such a thing may conceivably happen, but the averment is too uncertain, the eventuality too doubtful and remote for this court to judge it at this time in this proceeding. Anyhow, the complainants by the prayer of their bill ask specifically for relief by injunction against the action of the railroad company in extending its line. They nowhere pray for relief against abandoning lines.

There is no secret or deception in what the railroad company is trying to do. It, avowedly, is trying to meet motor truck competition which has an advantage over rail transportation in the store door receipt and delivery of freight. It does not intend to invade new territory by extending its line of tracks or expanding its lighterage facilities, the equivalent of tracks, a foot beyond their present termini, or by establishing new terminals, but intends by its proposed practice of co-ordinating rail transportation and truck service to reach its patrons, present and prospective, within New York City—territory into which it now enters and which it now serves—by delivering and receiving at

their doors freight which it has transported or is about to transport over its rails and thereby hold to itself the traffic which it still has and, if it can, take traffic from competing truck carriers along the highways and, of course, take local traffic from the complainants. If the service should be successful someone will inevitably be hurt. That is one of the inescapable consequences of competition, even when lawfully practiced. Yet, while there is nothing wicked or unlawful in competition per se, the question remains whether the railroad company can lawfully compete for traffic in this way. The answer to that question is to be found in the law by which the railroad company's activities are limited and regulated, the applicable provisions in this instance being Interstate Commerce Act, supra, section 1, paragraphs 3, 18–22 (49 USCA § 1 (3, 18–22).

Paragraph 18 of section 1 of that act makes it unlawful for any carrier by railroad subject to the act to undertake "the extension of its line of railroad" or to "engage in transportation * * * by means of such * * * extended line of railroad," and likewise makes it unlawful for any such carrier to "abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the [Interstate Commerce] Commission a certificate that the present or future public convenience and necessity" require such extension or permit of such abandonment.

Paragraph 22 as added by Transportation Act § 402, 49 USCA § 1 (22), provides as exemptions from the scope of the provisions of paragraph 18 "the construction or abandonment of spur, industrial, team, switching, or side tracks. * * *" Other paragraphs provide for the procedure and the enforcement of the Commission's order.

And, finally, paragraph 20 affords "any party in interest" a remedy by injunction, the one here invoked, against "any construction, operation, or abandonment [of a line of railroad] contrary to the provisions" of the critical paragraphs.

In interpreting the expression "extension of its line of railroad" by a railroad company, conditioned upon permission by certificate, it is pertinent to note that the Congress by separate definitions in paragraph 3 of section 1 of the act (49 USCA § 1 (3) recognized and stated the wide variety of subjects with which it was dealing; all connected of course with interstate commerce. It defined the term "common carrier" under which the defendant railroad company admit-

tedly falls. It next defined the term "railroad" to include "all bridges, car floats, lighters, and ferries \* \* \* operated in connection with any railroad, and also all the road in use by any common carrier," all "tracks, terminals, and terminal facilities," and "all freight depots, yards, and grounds," indicating clearly the physical setup of a railroad system. The Congress next defined "transportation," which we must assume is different from "railroad" as it found it necessary to give it a different definition, saying it includes "locomotives, cars, and other vehicles, \* \* \* and all instrumentalities and facilities of shipment or carriage, \* \* \* and all services in connection with the receipt, delivery, \* \* \* and handling of property transported." This definition of "transportation"—transportation being the act of carrying or conveying freight from one place to another—is, from its very nature and in respect to its subjects less fixed and less physical than those within the definition of "railroad" and is broad enough to include within its ordinary meaning tangible yet portable instrumentalities and services which are intangible yet connected with the receipt, rail movement and delivery of freight.

We have ventured to note these distinctions in the definitions of the terms "railroad" and "transportation" for "where the law distinguishes, we look for some difference, and perhaps for some contrast." Fuller v. Bryan, 20 Pa. 147.

With these definitions and their difference in mind, the Congress by paragraph 18 of section 1 of the act coined and used a new and altogether different expression—the disputed expression "extension of (a) line of railroad." Evidently thinking it spoke for itself, the Congress did not define it. It now devolves upon the court to interpret this expression in the light of and perhaps in contrast to the several definitions which the Congress has given.

If, by paragraph 18 of section 1 of the act, the Congress had declared against an extension of "transportation," it would likely apply to the defendant's proposed service. If it had declared against an extension of a "railroad," its meaning might be open to debate. But when it declared against an extension (without a certificate) of a "line" of railroad, words, we must assume, it expressly selected, and often repeated in other sections of the act directed to the same subject, it would seem that the Congress, making distinctions or intent upon making its purpose certain, meant precisely what it said, namely,

"an extension of its line," that is, an extension of the railroad company's road, yards, tracks, with their terminals and terminal facilities, and barges, car floats, lighters and ferries, or so many of these instrumentalities as would, in a given instance, constitute a "line." United States v. B. & O. R. R. Co., 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218.

Aside from the literalism of the expression, its meaning is brought more clearly into view by the avowed purpose of the Congress, revealed in the Transportation Act of 1920 (41 Stat. 456), of establishing a new policy in respect to transportation. There it indicated with no uncertainty that the nation has a concern and the public an interest in the extension of a line of railroad into new territory by preventing, if such be the case, a profitless extension whereby capital charges and operating costs will be increased and, in consequence, freight rates raised; and, conversely, by preventing the abandonment of a railroad in territory which still needs it, and providing, in the public interest, that neither of these things can be done by a railroad company of its own will but only on allowance by the Commission after a finding that it will be convenient and necessary to the public. Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; Texas & P. Ry. Co. v. G., C. & S. F. Ry. Co., 270 U. S 266, 46 S. Ct. 263, 70 L. Ed. 578; Texas & N. O. R. Co. v. Northside Belt Ry. Co., 276 U. S. 475, 48 S. Ct. 361, 72 L. Ed. 661; Western Pacific Cal. R. Co. v. So. Pac. Co., 284 U. S. 47, 52 S. Ct. 56, 76 L. Ed. 160; Piedmont & Northern Ry. Co. v. I. C. C., 286 U. S. 299, 52 S. Ct. 541, 76 L. Ed. 1115.

Except that it is contested, it would seem that the words in question plainly mean not an extension of a transportation service in connection with an established railroad but an extension of a railroad line, the thing itself.

Looking at the service termed "accessorial terminal service" which the defendant railroad company here proposes to put into effect and searching for its true character and exact place in a system of rail transportation, it clearly is not a "railroad." It is a "service"; one "connected with the receipt and delivery \* \* \* of property transported" within the definition of "transportation." The creation and extension of such a service is not in any sense a "construction" or an "extension of (a) line of railroad" for which a certificate is required. It may be, and doubtless is, an improvement and exten-

sion of transportation service for which no certificate is required yet for which tariffs must be filed. Moreover, the spirit and purpose of the act, so far interpreted, indicate it to be a service for terminal receipt and delivery of freight by motor truck, a facility of transportation, not an extension of a railroad line. While we have been shown no controlling decision on the precise service tendered in this case, the evident trend of decisions of the Interstate Commerce Commission and the courts is to the effect that when a service by motor truck, drayage or transfer falls within the scope of the expression "terminal facilities" or "services in connection with the receipt (and) delivery" of freight the Commission has jurisdiction with respect to tariffs to be charged but has no power to require a certificate of public convenience and necessity before the service can be put into operation. In re Tariffs Embracing Motor-Truck Service, 91 I. C. C. 539, 546, 547; Constructive and Off-Track Stations, 156 I. C. C. 205; Transfer of Freight Within St. Louis and East St. Louis, 155 I. C. C. 129; Jaloff v. Spokane, etc., Ry. Co., 152 I. C. C. 758; Discontinuance of Inland or Off-Track Stations in New York City, 173 I. C. C. 727; Texas & Pacific Ry. Co. v. Gulf, Colorado, etc., Ry. Co., 270 U. S. 266, 278, 46 S. Ct. 263, 70 L. Ed. 578; Railroad Commission v. Southern Pacific, 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713; Interstate Commerce Commission v. Detroit, etc., Ry. Co., 167 U. S. 633, 17 S. Ct. 986, 42 L. Ed. 306. Particularly the last cited case distinguishes in reasoning the case of United States v. B. & O. R. R. Co., 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218, where the railroad company extended its line by floats and lighters across the Hudson River and established a new terminus in New York City.

These authorities are highly persuasive that the service which the defendant railroad company proposes falls within the definition of "transportation" and outside any interpretation of "line of railroad."

The complainants, however, insistently take the opposite position. They realize, of course, that paragraph 18 of section 1 of the act lacks words that expressly uphold their position and ask the court to find them there by necessary implication. To this end the complainants first point to the definition of the term "transportation" as including not only "services in connection with the receipt, [and] delivery" of freight but "locomotives, cars, and other vehicles" which they say, quite correctly, embraces motor trucks; and then point to the definition of "railroad" as including "terminal facilities of every kind used and necessary in the transportation and delivery of" freight, which, also, they say (inferentially) embraces motor trucks, though already included in the definition of "transportation." Over the subjects of both of these definitions the Interstate Commerce Commission unquestionably has jurisdiction but over none of them is its jurisdiction dependent on a finding of public convenience and necessity. So far the complainants have little help from the definitions of the statute, viewed separately. But they urge the two terms, "transportation" and "railroad," should, though separately defined, be read together in order to make the term "railroad" complete, and when so read it includes motor trucks within the words "other vehicles" of the definition of "transportation." Finally, they contend, without giving any significance to the term "line of," that the word "railroad" found in the expression "extension of (a) line of railroad" is the "railroad" within its own definition (now, by constructive transposition, including "other vehicles" or motor trucks) and may be extended by motor trucks, but requiring, before it can be lawfully done, a certificate of public convenience and necessity, as in case of extension by road and tracks. Shortly, the complainants read or import the word "transportation" (clearly including trucks) into the word "railroad," and read the word "railroad" (now including trucks on their construction) into the expression "line of railroad." Having thus by construction made motor trucks a part of a "line of railroad," the complainants confidently say the defendant railroad company in undertaking to extend, without a certificate, its "line of railroad" by trucks to the doors of its patrons is proposing an unlawful thing and should be enjoined.

With the theory of the complainants' case, presented with much greater force than is indicated by the simple terms to which we have reduced it, we do not, for the reasons stated, find ourselves in accord. To be more definite, we hold that the proposed accessorial terminal service by trucks is not a "railroad," nor is it a "line of railroad," nor "an extension of a line of railroad," but it is a service of transportation which may be rendered by the defendant railroad company without first obtaining from the Interstate Commerce Commission a certificate of public convenience and necessity, subject of course to tariffs filed and allowed.

The decree of the District Court is affirmed.