**JAY STREET CONNECTING RAILROAD, Plaintiff,**

v.

**UNITED STATES of America, Defendant,**
**Interstate Commerce Commission, Intervening Defendant,**
**William Meyers, Standard Brands, Incorporated, Atlantic Gummed Paper Corp. and Warshaw Manufacturing, Inc., Intervening Defendants,**
**Moses Spatt and Joseph S. Wohl, Intervenors.**

No. 19821.

United States District Court
E. D. New York.
June 26, 1959.

---

J. Bertram Wegman, New York City (Wegman, Epstein & Burke, New York City, on the brief), for plaintiff.

B. Franklin Taylor, Jr., Assoc. Gen. Counsel, Interstate Commerce Commission, Washington, D. C. (Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., on the brief), for United States of America and Interstate Commerce Commission.

Richard S. Buell, New York City (McLanahan, Merritt & Ingraham, New York City, on the brief), for intervening defendants William Meyers et al.

Whitney North Seymour, Sr., New York City (Simpson, Thacher & Bartlett, New York City, on the brief), for intervenors.

Before LUMBARD, Circuit Judge, and BYERS and RAYFIEL, District Judges.

LUMBARD, Circuit Judge.

■ . The primary question presented in this proceeding to enjoin the effectiveness of a certificate of the Interstate Commerce Commission permitting abandonment of the Jay Street Connecting Railroad, 49 U.S.C.A. § 1(18),[1] is whether the action of the Commission is based upon adequate findings supported by substantial evidence. See Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; I.C.C. v. Union Pac. R. Co., 1912, 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; see also, 49 U.S.C.A. § 14(1); Alabama Great So. Ry. Co. v. United States, 1951, 340 U.S. 216, 228, 71 S.Ct. 264, 95 L.Ed. 225. We hold that the Commission's findings justify its conclusion that "public convenience and necessity permit of such abandonment," 49 U.S.C.A. § 1(18), despite the interest of these intervenor users in continued service, and that the record amply supports its finding that this railroad's "future operating revenues will not be sufficient to cover the cost of providing safe facilities and continued transportation service as presently conducted." The Commission's findings and conclusions rest "principally upon the record of past operating results and prospects of future improvement, if any, weighed against the proved need of the users of the applicant's carrier service and the effect of the proposed abandonment upon the public generally."

The Jay Street Railroad's main track of 3,102 feet extends for 7 city blocks in a small area of Brooklyn lying along the East River under and on either side of the ramp of the Manhattan Bridge. Bridge Street Yard is the main yard and consists of team tracks, holding tracks and classification tracks and a float bridge. This is at the railroad's easterly end and at the westerly end is its Empire Yard. There is no public terminal; there is no passenger traffic.

The railroad delivers and receives freight cars solely by means of numerous spur tracks and team tracks totalling 6,313 and 3,352 feet respectively. Thus the railroad's business consists almost entirely of servicing the few large industries whose properties adjoin its tracks and are served by its spurs.

Some of the railroad's main line and other trackage lies in the city streets and is leased from the City of New York at an annual rental under a franchise and lease contract which runs until December 31, 1961. The tracks and other land used by the railroad and not leased from the City are owned by Famous Realty Co., the successor of Famous Realty, Inc. and are rented to the railroad. About July 1, 1958 Famous Realty, Inc. was dissolved and its assets were distributed to its two stockholders, Moses Spatt and Joseph S. Wohl, who own all the stock of the railroad and who now hold the property under the firm name of Famous Realty Co. The railroad formerly was the lessee of Famous Realty, Inc. under a 10 year lease dated December 1, 1941 as detailed in the Commission's report. The railroad was obligated to pay real property taxes and assessments, to pay for insurance and to pay an annual rental equal to 2% of the assessed value of the leased property plus additional payments contingent upon its net income. When the lease expired it was not renewed but according to Moses Spatt its provi-

1. This proceeding was instituted by the railroad which sought to modify the Commission's order by removing from it a 30 day stay from the date of service, which relief we denied without opinion on June 18. The intervenors, Meyers et al., then filed a cross-claim attacking the abandonment on the merits, and it is with the cross-claim that this opinion is principally concerned.

sions have been continued in effect on a year to year basis and since June 1958 on a month to month basis. According to the record, the railroad has made no payment of rent or taxes during the past 4 years.

The railroad owns the tugboat McCormack, built in 1900, a carfloat with capacity for 14 railroad cars, three obsolete diesel-electric switching locomotives, two flatcar type car-frames, several cranes, repair machinery and various motor vehicles and trucks. Almost all of this property is in need of extensive and costly rehabilitation, according to the report of the Commission.

On June 17, 1958 the railroad applied to the Commission for a certificate of convenience and necessity authorizing abandonment of its operations. Subsequently users and an adjoining property owner secured an injunction against abandonment without I.C.C. approval, and the Court of Appeals affirmed. Meyers v. Jay St. Connecting Co., 2 Cir., 259 F.2d 532; 2 Cir., 262 F.2d 676. There is presently outstanding a permanent injunction against abandonment without approval of the I.C.C.

On April 13 the Commission, having expedited its proceeding pursuant to the suggestions of the Court of Appeals, in a thorough and detailed 40 page opinion affirmed the examiner's preliminary report and certified abandonment. Thereafter it granted a petition for reconsideration and on May 26 reaffirmed its original order modifying a condition on the abandonment to require sale to any interested person for continued operation. See fn. 2 infra.

This proceeding pursuant to 28 U.S.C.A. § 2325 (1952) was commenced by the railroad on June 1, 1959. See fn. 1 supra. Thereafter on June 10, Meyers, an owner of property serviced by the railroad, and several users of the railroad, intervened in the proceeding, 28 U.S.C. § 2323, and filed a cross-claim attacking the issuance of the certificate on the merits. On June 15 the landlords, Spatt and Wohl, also intervened to raise certain questions discussed below as to the scope and effectiveness of the sale condition.

The Commission in its report finds that this railroad has sustained operating losses every year since 1953 amounting in each successive year and the first seven months of 1958 to $38,236, $18,290, $77,021, $120,562, $124,746, and $175,609 respectively; that in the years 1953 through 1957 the total number of carloads that moved over the line were 10,165, 10,224, 10,120, 9,249, and 8,704 and that there is a continuing and increasing diversion of business to competing transport facilities; that in its present physical condition the railroad requires at least $224,000 of rehabilitation, with an additional $200,000 required within a few years; and that there is no substantial possibility of such economies or increases in revenue as would justify continuance of the line.

The intervening protestants dispute these findings and the conclusion which rests upon them on two bases which we shall discuss in detail. At the outset, however, we note that each and every contention advanced here was made to the Commission, was exhaustively considered by it, and was rejected on the facts in an extensive and able opinion.

The first attack of protestants on the Commission's order is based upon the railroad's corporate relationship to the Famous Realty Company, of which it is a wholly owned subsidiary. They urge that as a result of this corporate relationship and of the undisputed existence of intercorporate transactions between parent and subsidiary amounting, as the Commission found, to about $200,000 per year, the Commission was obliged to place upon the applicant-railroad the burden of establishing the fairness of each and every one of its transactions with Famous by affirmative evidence. The Commission did not impose such a burden. It found that the specific transactions attacked by protestants were not unfair, and it gave protestants ample opportunity to cross-examine protestants'

witnesses, including its long-time accountant, to examine its books, which protestants apparently declined to do, and to present such affirmative evidence of overreaching as it desired, which it also failed to do.

The protestants' argument that the Commission was obliged to place a higher burden of proof on the applicant amounts to an assertion that the affirmative evidence of its financial condition introduced by the applicant before the examiner was inherently unbelievable and therefore inadequate to sustain a finding that it did in fact sustain continuous and increasing operating losses. We are faced therefore with the question whether the Commission was within its discretion in expressly crediting the evidence of the applicant and its officers and employees as to its financial condition in prior years without requiring of them affirmative documentation of the fairness of each and every item of intercorporate expense. We have no doubt that it was.

The Commission did expressly consider each of the specific transactions which the protestants here allege to have been unfair, and found no unfairness. Thus protestants here assert the failure of Famous to credit the railroad with retroactive tax and rent reductions on land leased by the railroad from Famous, which reductions resulted from successful certiorari proceedings instituted and prosecuted by Famous in the New York courts to reduce the assessed valuation of the properties. Protestants contend that a retroactive credit to the railroad for years prior to 1952 in the amount of $162,000 was required. First of all, we find no support in the record for the assumption that the credit, if one were required, would even approximate the sum contended for by protestants. It is more important, however, that the Commission found, and its findings are amply supported, that the lease, which it had formally approved in 1941 (244 I.C.C. 43), did not provide for such credits as to past years; that the railroad did not participate in the costs of the certiorari proceedings; and that credits were made for all years subsequent to the proceedings and the charges were reduced by Famous as a result of the successful litigation it had conducted. Protestants contend that Famous and the Railroad failed to carry on negotiations for reduction of the rent under the lease when the railroad ceased using certain of the properties originally demised. The Commission reasonably found the railroad's retention of the demised premises justified since "the properties not presently used for railroad purposes but included in the lease, are available if and when needed." The Commission similarly found no unfairness in the rent charged the railroad by Famous for the Vanneck parcel, a portion of the railroad's Bridge Street Yard which was acquired by Famous as a result of condemnation proceedings prosecuted by the railroad in the New York State courts, or in the charges by Famous outside the lease for rental of additional office space used by the railroad, or in the fact that the railroad at a cost of $22,000 built a shop on the Vanneck parcel prior to its acquisition by Famous although the title thereby passed to the landowner by operation of law. As to these latter objections the Commission found both that the economies expected from the shop justified its construction under the circumstances, and that any implication of overreaching which might nevertheless be drawn from these circumstances was overweighed by the fact that Famous did not exercise its power under the lease to increase the rent.

In such circumstances, and in the absence of other affirmative evidence of overreaching, the Commission was not bound to disbelieve the applicant's evidence, or to find the evidence insufficient to sustain a conclusion as to its financial condition. The cases of Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 and Perlman v. Feldmann, 2 Cir., 1955, 219 F.2d 173, 50 A.L.R.2d 1134 are not controlling here. This railroad is accountable not to the interven-

ing shippers and interested parties, but to the Commission itself, which stands as the primary statutory arbiter and protector of the public interest. While courts have held that the fiduciary obligation of controlling stockholders may be asserted by creditors in bankruptcy, Pepper v. Litton, supra, and by minority shareholders in a sale by the majority of its controlling interest, Perlman v. Feldmann, supra, and thus shift to the fiduciaries the obligation to prove their fairness, such a rule is not per se applicable to the Commission. In the exercise of its expert judgment it may determine whether there is such evidence of overreaching as would require further proof from the applicant of its financial condition. Where, as here, the record contains substantial unrefuted evidence to support the Commission's conclusions as to the railroad's financial condition, and the Commission has weighed the proffered evidence of overreaching and found that further proof of the applicant's financial condition was not required, this court will not substitute itself for the Commission and reweigh the evidence. See, e.g., I.C.C. v. Union Pac. R. Co., supra.

In addition to their assertions with regard to the railroad's burden of proof in abandonment proceedings, these protestants also assert that the railroad, as a result of its corporate relationship to Famous, the sharing of facilities, employees and the like, is no more than an instrumentality of its parent, so that the Commission was bound to consider the propriety of abandonment of the railroad in the light of the profitability of the combined enterprise. Since the Commission specifically rejected this contention, holding that "we are in a position properly to determine the essential issues required under section 1(18) of the act, without looking beyond the applicant's corporate status," protestants confine their argument here to the assertion that the Commission has failed to comply with the provisions of § 8(b) of the Administrative Procedure Act, 5 U.S.

C.A. § 1007(b), which requires, in pertinent part, "a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record * * *," in that it has insufficiently stated its reasons for so rejecting the claimed relationship. We do not agree.

The Commission expressly found that the operations of Famous and the railroad were separately conducted, that books were separately and fairly kept, and that "each corporation in question is a specialized enterprise and neither interferes with nor exercises the business functions of the other." In the course of its opinion the Commission considered the bulk of the contentions made here in support of the claim that the parent and subsidiary must be regarded as a single entity, and rejected them.

We think it unnecessary to review these contentions in detail, since once it has been determined that the Commission properly found that the railroad has been sustaining large and continuing operating losses without a substantial possibility of future improvement, the case of Brooks-Scanlon Co. v. Railroad Commission, 1920, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 is controlling. The Supreme Court there held that a profitable lumber-company parent could not be constitutionally compelled to operate a railroad subsidiary which was in fact operating at a loss merely because the operations of the parent were profitable. The Commission here found no evidence, and the record does not disclose any evidence, that the purpose of the corporate relationship was to frustrate the statutory duties imposed upon the railroad. Cf. Chicago, Milwaukee & St. Paul Ry. v. Minneapolis Civic Ass'n, 1918, 247 U.S. 490, 38 S.Ct. 553, 62 L. Ed. 1229. The Commission was therefore bound to reject the protestants' assertion. Its findings are ample to reveal that its conclusion was so grounded, and that is all that is required of it. See,

Capital Transit Co. v. United States, D.C.1951, 97 F.Supp. 614, 615, 621.

Protestants next contend that the examiner and the Commission committed prejudicial error in preventing the attempted impeachment of Moses Spatt, the chief executive officer of both the railroad and Famous, with certain allegedly contradictory prior statements in his 1954 testimony in the proceedings to condemn the Vanneck property. The Commission found, and the protestants do not now challenge the finding, that many of the allegedly contradictory statements of Spatt were placed on the record. The examiner and the Commission found that these statements were not in fact contradictory but that they were consistent with the record in this proceeding, and we agree. The contest here concerns the rejection by the examiner of an offer of alleged prior statements of Spatt in 1954 with regard to the kind and extent of rehabilitation engaged in by the railroad. It was offered by protestants' counsel to impeach the testimony of Spatt as to the present extent of necessary rehabilitation of the railroad. Specifically, the examiner rejected an offer to confront Spatt with testimony in 1954 that facilities presently said to be in need of extensive repair had been, in counsel's words, "completely rehabilitated" between 1945 and 1954. We agree with the examiner and the Commission that such testimony was properly excluded.

■ The present condition of the railroad was established by the applicants through the testimony of an expert engineer, who was extensively cross-examined. The relevance and weight of Spatt's testimony is not free from doubt, but at most an inference of a contradiction might have been drawn, which would have depended then as it does now on the meaning of "rehabilitation" as Spatt used the term. It was within the discretion of the examiner to refuse an offer of such peripherally relevant and dubiously contradictory testimony, since other prior testimony of Spatt had already been placed upon the record, and the examiner

had properly found that it was entirely consistent with the evidence adduced before him. It was within his power to terminate the line of inquiry. Cf. Glasser v. United States, 1942, 315 U.S. 60, 82, 62 S.Ct. 457, 86 L.Ed. 680. But in any case, even if it were to be assumed that there was error in the exclusion, and that there was some inconsistency in the statements, such error was not so prejudicial as to justify reversal. See Loesch v. Federal Trade Comm., 4 Cir., 1958, 257 F.2d 882.

■ Protestants' complaint based on the refusal of the Commission to reopen its proceedings for consideration of a report on necessary rehabilitation of the applicant's float-bridge submitted in a collateral proceeding in the District Court for the Eastern District of New York by a court-appointed expert is entirely without merit. First, the subject matter of the report concerned short-term repairs, and the Commission's concern was with long-term continued operations, and it is doubtful that such evidence contradicted the railroad's expert. Second, the protestants had ample opportunity to introduce any evidence on rehabilitation they desired during the proceedings, and failed to avail themselves of it. They cannot complain now of the Commission's refusal to hear so tardy an offer.

■ The Commission was similarly justified in concluding that in the circumstances of this case no direct consideration needed to be given to the possibility of revision of the freight divisional arrangements between the applicant and trunk-line roads so as to increase the railroad's revenues. The Commission declined to consider this possibility in detail because it found that the applicant's divisions were substantially the same as those of other connecting carriers in the area of applicant's operations, and because it found that such flexibility as might be discovered in the divisions would be insignificant in the light of the applicant's proved operating deficits and necessary rehabilitation. It was within the expert competence of the Commission

to make such a judgment, see, e. g., Feinstein v. N. Y. Central R. R. Co., D.C.S.D. N.Y.1958, 159 F.Supp. 460, 464, and the fact that in other circumstances the Commission itself has instituted such an inquiry, see Abandonment of Wyo. & Mo. Ry., 131 I.C.C. 145 (1931), is irrelevant.

■ Finally, protestants challenge the Commission's affirmance of the examiner's refusal to issue a subpoena duces tecum for the production of a contract between Famous and the Consolidated Edison Co. for the sale of certain property occupied by the railroad. The Commission correctly affirmed the examiner, having found that the terms of the contract were irrelevant, since the sale could take place "only if and after" the applicant received an appropriate certificate permitting abandonment, and since the terms of the sale could not affect the question whether the abandonment is permitted by public convenience and necessity.

■ There remain only those issues which were raised by the intervening protestants and the intervening landlords, Spatt and Wohl, as to the scope of the condition on abandonment providing for sale of the railroad for continued operation imposed by the Commission's order as amended on May 26th.[2] The essence of the question presented by the parties is whether and to what extent that condition purports to or may affect future interests in the property of the landlords not presently held by the railroad. To the extent that it is claimed that the condition is unlawful and must be set aside because it purports to bind the landlords to the sale of interests not now held by the railroad the question of the validity of the condition is properly before us. 28 U.S.C. § 2325 (1952). We hold that the condition does not purport to do more than require the railroad to sell whatever future interests it may have in the property it presently occupies, as it plainly states that it is intended that "the purchaser of the physical properties shall be substituted for and occupy the same status as the applicant * * *." Accordingly we do not reach the question whether the order can bind the landlords. Further questions that were presented as to whether the landlord is independently subject to a duty to lease or sell to such a putative purchaser are not properly before us, both because they are premature, since the record reveals no attempt to negotiate with the landlords, and because they do not concern matters within our jurisdiction under 28 U.S.C. § 2325. The interpretation of the railroad's duty to continue operations under the condition is properly the subject of a proceeding under § 1(20) of the Interstate Commerce Act before a single judge district court to prevent improper abandonment, and in this case, as we have pointed out, there has already been issued a permanent injunction against abandonment without permission of the Commission.

Affirmed.

2. "The applicant shall sell to any responsible person, firm, or corporation, offering within 30 days from the date of service hereof to purchase the same for continued operation of the railroad line here involved or any portion thereof, any or all of its property necessary or useful to such continued operation, including the applicant's rights and interests as lessee or tenant in respect of any such property and facilities used or useful in the operation of its line of railroad, at a price not less than the net salvage value of the properties and interest sought to be acquired, it being intended by this condition that the purchaser of the physical properties shall be substituted for and occupy the same status as the applicant now does with respect to said leasehold interests."