281 F.2d 379
 LONG ISLAND RAIL ROAD COMPANY, Brooklyn Eastern District
Terminal, Bush Terminal Railroad Company and New
York Dock Railway, Plaintiffs-Appellants,
v.
NEW YORK CENTRAL RAILROAD COMPANY, Defendant-Appellee.
 No. 379, Docket 26371.
 United States Court of Appeals Second Circuit.
 Argued July 14, 1960.
Decided July 21, 1960.
 
 Richard H. Stokes, Asst. Gen, Counsel, The Long Island Rail Road Company, New York City, and John F. Finerty, New York City, Atty. for Brooklyn Eastern District Terminal (Otto M. Buerger, Jamaica, N.Y., Atty. for The Long Island Rail Road Company, Hays, St. John, Abramson & Heilbron, New York City, Attys. for Bush Terminal Railroad Company and New York Dock Railway, and Morris Shilensky, of Hays, St. John, Abramson & Heilbron, New York City, on the brief), for plaintiffs-appellants.
 J. H. Shapiro, New York City (Gerald E. Dwyer and J. H. Colgren and G. J. Schwarz, New York City, on the brief), for defendant-appellee.
 Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 Plaintiff railroads appeal, 28 U.S.C. 1292(a)(1), from an order of the District Court for the Eastern District of New York, in an action under 1(20) of the Interstate Commerce Act, 49 U.S.C.A. 1(20), refusing to grant a temporary injunction against defendant New York Central's establishing truck and tractortrailer service to a new freight depot of the Central at 10 Jay Street, Brooklyn, as proposed in tariff schedules fled with the Interstate Commerce Commission. Admittedly the Central has not obtained a certificate for the service under 1(18) of the Interstate Commerce Act, 49 U.S.C.A. 1(18); it says none is needed.
 
 
 2
 The island location of large parts of the New York metropolitan district and the mainland termination of the rail lines of many of the carriers serving it have long posed special problems to freight service in this area. Constructive and Off-Track Railroad Freight Stations, 156 I.C.C. 205 (1929), gives the history not only for Manhattan but for the entire New York terminal district. See also United States v. Baltimore & Ohio R.R., 1913, 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218, dealing, interestingly enough, with Jay Street. For decades the Central, whose rail lines terminate in the Bronx, Manhattan, and New Jersey, has conducted freight service to and from Brooklyn by a variety of land and water-borne vehicles. It has done this by serving a station (Wallabout Station) which was its own until 1934 and then a union station until 1941, by joint rates and routes with plaintiff Long Island, and by arrangements with the plaintiff Brooklyn terminal lines, as well as with Jay Street Connecting Railroad now abandoned, Jay Street Connecting Railroad, Abandonment of Entire Line, 307 I.C.C. 137, affirmed D.C.E.D.N.Y.1959, 174 F.Supp. 609. See also Meyers v. Jay St. Connecting R.R., 2 Cir., 1958, 259 F.2d 532.
 
 
 3
 The service here proposed by the Central was designed at least in part, to enable it to reach the same part of Brooklyn formerly served in cooperation with the Jay St. Connecting Railroad. The service is between a warehouse, known as the Phoenix Warehouse, at the corner of John and Jay Streets, and the Central's railheads in Manhattan and New Jersey. Freight received from or delivered to consignors' or consignees' truckmen at the freight depot will be handled by truck between the depot and the railheads; tractor-trailers will be similarly accepted and delivered. The Central will pay for the haul between the depot and its team tracks; consignees or shippers will pay for transportation between the depot and their premises, plus a charge for loading or unloading at the team tracks.
 
 
 4
 The tariffs, originally filed to become effective June 21, 1959, were suspended by the Interstate Commerce Commission, I. & S. Docket No. 7193, upon plaintiffs' protest. In the proceedings before the Commission, plaintiffs attacked the Central's proposal on various grounds not here material, and plaintiff Long Island R.R. Co. raised the point here urged, namely, 'that establishment of the proposed station would constitute an extension of a line of railroad within the meaning of section 1(18) of the act, and, consequently, is unlawful without prior aplication and the issuance of a certificate of convenience and necessity.' On April 20, 1960, Division 2 filed a report finding 'that the proposed schedules are not shown to be unlawful' and entered an order discontinuing the investigation and suspension proceeding. The Division found the Long Island's claim with respect to the need of a certificate under 1(18) without merit, saying:
 
 
 5
 'It is well settled that the establishment or maintenance of motortruck service by a common-carrier railroad does not constitute an extension of a line of railroad within the meaning of section 1(18) for which a certificate of convenience and necessity is required. Drayage and Unloading at Jefferson City, Mo., 206 I.C.C. 436, 439.'
 
 
 6
 Thereupon plaintiffs brought this action under 1(20) in the Eastern District of New York to enjoin what they claimed to be an unlawful operation by the Central. Judge Bartels issued a temporary restraining order pending his determination of plaintiffs' application for a preliminary injunction. The Central cross-moved to dismiss for lack of jurisdiction and for failure of the complaint to state a claim on which relief may be granted. On June 28, 1960, in a well-reasoned opinion, the judge overruled the Central's contention that under 28 U.S.C. 2325 plaintiffs were required to sue before a three-judge court, 28 U.S.C. 2284, but denied a preliminary injunction on the ground that plaintiffs had failed to establish sufficient probability of success. He also denied the Central's motion to dismiss for failure to state a cause of action; this is not before us. He continued the temporary restraining order for a brief period to permit plaintiffs to apply to this Court for an extension of it. Thereupon plaintiffs appealed from the denial of the preliminary injunction and sought an extension of the restraining order. Recognizing that the latter request raised substantially the same issues as the appeal itself and that the case was of public as well as private importance, the Court set the appeal for early argument and continued the temporary restraining order pending determination of the appeal.
 
 
 7
 We deal first with the Central's contention that plaintiffs' remedy was before a court of three judges rather than a single judge. Section 1(20) of the Interstate Commerce Act provides in effect that any construction or operation in violation of the certificate requirements of paragraphs (18), (19) or (20) 'may be enjoined by any court of competent jurisdiction at the suit of * * * any party in interest.' 28 U.S.C. 2325 requires a three-judge court when a plaintiff seeks 'An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission * * *' Here plaintiffs seek to enjoin not an order of the Commission but action proposed to be taken by the Central without the order from the Commission which plaintiffs say is necessary for legality. A suit before a single district judge has long been the remedy in such a case, see e.g., Texas & Pacific Ry. v. Gulf, Colorado & Santa Fe Ry., 1926, 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578; Piedmont & Northern Ry. v. I.C.C., 1932, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115. Although these cases did not discuss the point, Powell v. United States, 1937, 300 U.S. 276, 287-289, 57 S.Ct. 470, 477, 81 L.Ed. 643, does and is decisive. The Court there dismissed a counterclaim by the Central of Georgia seeking to enjoin a service by the receivers of the Seaboard Air Line for which no certificate had been obtained, in part, because the counterclaim was in a suit by the Seaboard triable before a court of three Judges; 'Suits under that paragraph (1(20)) may not be tried before three judges. Those under the Urgent Deficiencies Act (28 U.S.C. 47) (now 28 U.S.C. 2325) to set aside orders of the Commission cannot be tried in any other court.' Per contra, when the Commission has granted a certificate which an objecting party claims invalid, the exclusive remedy is before a three-judge court. Claiborne-Annapolis Ferry Co. v. United States, 1932, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808. That the alleged need of a certificate was one of the arguments unsuccessfully advanced in the investigation of the Central's tariffs does not bring the case within 28 U.S.C. 2325. Assuming that plaintiffs might have brought suit to enjoin the Commission's order discontinuing the investigation and suspension proceeding, as apparently occurred in I.C.C. v. Inland Waterways Corp., 1943, 319 U.S. 671 686-687, 63 S.Ct. 1296, 87 L.Ed. 1655, they have not done this, and Powell v. United States, supra, 300 U.S. at pages 288-289, 57 S.Ct. 470, 476, says they could not have raised the Central's need for a certificate under 1(18) in such a suit if they had. We are not persuaded by the Central's attempt to distinguish Powell v. United States on the basis that there the Commission had found the Seaboard's tariff unlawful under 6 as covering a station not on the Seaboard's line because of lack of valid contractual arrangements for use of the station rather than because of violation of 1(18). 206 I.C.C. at 366-68 (1935). For the Supreme Court put the portion of its decision annulling the Commission's order on the basis that 'The order, as construed and supported by appellees, in the practical equivalent' of 'a decree of court in a suit under 1(20) enjoining the Seaboard from extending its service because contrary to 1(18)' and 'The governing statutory provisions do not permit substitution of the Commission's order for a decree of court,' and the Court must have regarded the counterclaim in the same light.
 
 
 8
 Decision on the merits turns on interpretation of the mandate of 1(18) of the Interstate Commerce Act that 'No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate' of public convenience and necessity. One would not suppose, as a matter of ordinary speech, that the Central's hauling freight by truck or tractor-trailer between its railhead and a warehouse within the New York terminal district was 'the extension of its line of railroad.' However, plaintiffs rightly say the matter is not that simple; 'railroad' is a defined term in the Act and Congress can make a word mean what it chooses if only it tells us with sufficient clarity. Section 1(3) says 'The term 'railroad' as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, * * * and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property.' Hence, say plaintiffs, a freight depot is a railroad; ergo operation to or from a new freight depot is an extension of a line of railroad. Defendant challenges the conclusion, claiming this ignores the vital words 'line of' in 1(18); the definition of 'railroad' in 1(3), defendant says forcefully, makes it clear that service to and from the freight depot, even though conducted by motor truck, is 'The transportation of * * * property * * * by railroad' within the jurisdictional grant of 1(1) but does not transmute truck or trailer haulage through the city streets into a 'line of railroad.'
 
 
 9
 Indeed, defendant claims that precisely this was ruled in New York Dock Ry. v. Pennsylvania R. Co., 3 Cir., 62 F.2d 1010, 1011, certiorari denied 1933, 289 U.S. 750, 53 S.Ct. 694, 77 L.Ed. 1495, where the Court refused to enjoin, under 1(20), a proposal of the Pennsylvania 'without leave of the Interstate Commerce Commission, to deliver freight by motor trucks from its terminals directly to consignees and receive freight from consignors for delivery by trucks to its terminals and thus establish what it calls an 'accessorial terminal service,' popularly described as 'store door delivery and receipt of freight,' charging therefore tariffs to be filed with and approved by the Interstate Commerce Commission.' Such a truck movement, says the Central, is a 'terminal facility' within the general language of 1(3), even though not specifically mentioned as a 'freight depot' is, see Tariffs Embracing Motor Truck or Wagon Transfer Service, 91 I.C.C. 539, 546-47 (1924), Absorption of Drayage and Trucking Charges, 197 I.C.C. 675, 682-83 (1933), and thus is a 'railroad'; hence, it claims, the New York Dock Ry. case necessarily determined that addition of a new terminal facility, although part of a 'railroad,' is not an extension of a 'line of railroad' within 1(18). Plaintiffs deny this. Stressing the absence of a fixed phsical facility of the Pennsylvania in the New York Dock Ry. case, they point possages in the opinion characterizing the Pennsylvania's proposal as a 'service' within the definition of 'transportation' in 1(3), with the Court contrasted with 'railroad,' 62 F.2d at page 1013, and to the Court's conclusion, page 1014, 'that the proposed accessorial terminal service by trucks is not a railroad,' which 1(3) says that Jay St. freight depot is. We agree with plaintiffs that the New York Dock case is not controlling, at least on the basis whereon the Court placed it; however, the Court's distinction between 'railroad' and 'line of railroad' does point in defendant's favor.
 
 
 10
 With language and authority thus favoring defendant but not conclusive, we turn to administrative construction and to considerations of purpose and policy. These bring the scales down sharply on defendant's side.
 
 
 11
 We do not have to indulge in research as to what the administrative construction is, since the Commission has expressed itself as to this very case; however, it is relevant to inquire whether this construction was recent or of long standing. Appellants say the decision which the Commission cited in its report, Drayage and Unloading at Jefferson City, Mo., 206 I.C.C. 436, 439 (1935), is not apposite since the tariff there in question, like that in New York Dock Ry. v. Pennsylvania R.R., provided trucking service directly to or from the customer's premises, although, unlike that in New York Dock, it did not provide for an extra charge. See also Coordination of Motor Transportation, 182 I.C.C. 263, 367 (1932); Absorption of Drayage and Trucking Charges, 197 I.C.C. 675, 682-83 (1933). However, other Commission decisions have said or implied that action under 1(18) likewise is not required when the trucking service ends or begins at an off-track station. Transfer of Freight within St. Louis and East St. Louis by Dray and Truck, 155 I.C.C. 129, 149 (1929), said this as to the abandonment of an inland station, over an argument as to the reference to freight depots in the definition of 'railroad' in 1(3) almost identical with plaintiffs'. In the same year, in Constructive and Off Track Railroad Stations, 156 I.C.C. 205, 208, 209, 212 (1929), the Commission described the establishment of off-track stations in Manhattan after 1920, none of which had been certificated under 1(18), without any intimation that it thought certificates had been needed. Two years thereafter the Commission approved tariffs of the Pennsylvania and Lehigh Valley terminating such inland stations without suggesting that proceedings under 1(18) need be had, Discontinuance of Inland or Off-Track Stations in New York City, 173 I.C.C. 727 (1931), and a year later it followed the same course as to a tariff of the Nickel Plate establishing an off-track station in St. Louis, Off-Track Stations in St. Louis, 186 I.C.C. 578 (1932). The administrative construction is thus of long standing.
 
 
 12
 Appellants argue this administrative construction should not receive its customary weight because of the holdings, Cited above in our discussion of the jurisdiction of the District Judge, that under 1(20) the enjoining of extensions or abandonments which the Act prohibits without a certificate is for the courts rather than the Commission. However, it hardly follows from this that Congress would not wish the courts to give appropriate heed to a long-standing and consistent interpretation by the Commission in the discharge of duties confided to it. Section 1(18) cannot be deemed wholly forbidden ground to the Commission. Often the Commission must construe and apply 1(18) directly, as it would have had to do here if the Central had petitioned for a certificate and then moved to dimiss the petition for want of jurisdiction, see Lehigh Valley R.R. Conditional Sale Contract, 233 I.C.C. 359 (1939); Davidson Transfer and Storage Co. First Mortgage, 282 I.C.C. 521 (1952). And, despite some of Mr. Justice Butler's language in Powell v. United States, supra, we cannot believe the Commission is under a mandate to remain mute in an investigation and suspension proceeding as to whether the tariff contemplates action which the Commission believes it will be bound to seek to enjoin under 1(20). So far as concerns the relative roles of court and Commission, we see little distinction between 1(18) and 20a, relating to the issuance of securities. There also decision whether Commission authorization is needed is ultimately for the courts in civil or criminal proceedings, but weight has been given not only to positive administrative construction, United States v. New York, New Haven & Hartford R.R., 2 Cir., 1959, 276 F.2d 525, 530-31, certiorari denied, Tri-Continental Financial Corp. v. U.S., 1960, 362 U.S. 961, 80 S.Ct. 877, 4 L.Ed.2d 876 but also to long-standing administrative inaction, United States v. Chicago Norht Shore & Milwaukee R.R., 1933, 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583.
 
 
 13
 Appellants also challenge the administrative construction on the basis of certain decisions requiring certificates for the initiation or abandonment by railroads of operations conducted with vessels. Pennsylvania R.R. Abandonment, F.D. No. 18418 (1954) (unreported), relied on by plaintiffs, is readily distinguished as dealing with car floats; such operations may well be thought to be a physical extension of the 'line of railroad.' Acquisition by Alameda Belt Line, 105 I.C.C. 349 (1926), included car float service; to be sure, it also included lighters, barges and ferries, but there was no discussion whether certification was needed for these or, indeed, for the car floats themselves. On the other hand, Chesapeake Beach Ry. Co., Rerry, 166 I.C.C. 293 (1930), which gave rise to Claiborne-Annapolis Ferry Co. v. United States, supra, was an application for ferry service only. It is distinguishable here as dealing with an operation into territory not theretofore served by carrier. How Commission decisions declining jurisdiction under 1(18) over line haul operations of fail carriers by bus or truck, Jaloff v. Spokane, Portland & Seattle Ry., 152 I.C.C. 758 (1929); Arlington & Fairfax, Auto R. Co., Extension of Operation, 228 I.C.C. 479 (1938), are to be reconciled with it we need not inquire; the latter point is now largely academic since certification for line haul operation by motor vehicle is required by the Motor Carrier Act, 49 U.S.C.A. 303(a)(14), 306. See American Trucking Ass'ns v. United States, D.C.D.C.1936, 17 F.Supp. 655. We thus find no sufficient contrary indication in the ferry and car-float cases to cause us to disregard the Commission's long-standing administrative construction on the very issue with which we are here concerned.
 
 
 14
 Interpretation of 1(18) as not applying to initiation or abandonment of trucking service to a freight depot within a terminal district already served by a rail carrier likewise accords with the purpose of the statute and with considerations of practical administration. As explained in Railroad Commission v. Southern Pacific Co., 1924, 264 U.S. 331, 343-347, 44 S.Ct. 376, 68 L.Ed. 713, and in Texas & Pacfic Ry. v. Gulf, Colorado & Santa Fe R. Co., supra, 270 U.S. at page 277, 46 S.Ct. 263, the purpose of requiring a certificate for new construction was to prevent wastes of carrier resources, of two sorts-- waste of the resources of the constructing carrier by unwise expenditures and waste of the resources of other carriers by extension of a new carrier into an area adequately served by existing lines. Neither consideration is applicable to the situation at bar. No substantial capital expenditure by the Central is involved. Of course, there is a question whether furnishing the haulage without added charge will be an undue financial burden on the Central as against the advantages it expects to receive, but that is the same sort of question which the Commission regularly considers in rate cases-- and, indeed, could have been considered in the investigation and suspension proceeding here-- and does not differ because the trucks operate to or from a depot rather than the shipper's premises, as to which appellants do not seriously urge a certificate to be required even if the carrier absorbs the expense, Absorption of Drayage and Trucking Charges, supra. Neither is there new competition in the sense of a new carrier entering a market. The Central was competing in Brooklyn long before 1(18) was enacted; as with the Pennsylvania in the New York Dock Ry. case, what it here proposes is an improvement in service to an area already served. Indeed, the competitive effect is less than if it offered free transport to and from the customer's door, as the Cotton Belt did in Absorption of Drayage and Trucking Charges, supra. Moreover, were 1(18) applicable, it would cover abandonment as well as initiation; thus, under plaintiffs' interpretation, if the Central found the Phoenix Warehouse unsuitable or the terms of the warehouseman unsatisfactory, it would have to secure a certificate to abandon and a new certificate for a new location. It is scarcely credible that Congress meant the carrier or the Commision to be burdened with the panoply of a 1(18) hearing, with notice to the governor and three weeks' newspape publication, 1(19), for every such change of service. The Commission seems to have had some such consideration in mind when it first said that 1(18) did not apply to abandonment of an inland station, Transfer of Freight within St. Louis and East St. Louis by Dray and Truck, supra. The Los Angeles passenger terminal case, Railroad Commission v. Southern Pacific Co., supra, involving large scale relocation of main track, differs toto caelo.
 
 
 15
 The denial of a temporary injunction is affirmed. The temporary restraining order is vacated effective midnight July 28, 1960.